## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR MUTUAL BANK, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. |
| | ) | JURY DEMANDED |
| AMRISH MAHAJAN, ARUN VELUCHAMY, ANU VELUCHAMY, STEVEN LAKNER, RONALD TUCEK, PATRICK MCCARTHY, PAUL PAPPAGEORGE, RICHARD BARTH, THOMAS PACOCHA, JAMES REGAS, REGAS, FREZADOS & DALLAS LLP | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation, as Receiver for Mutual Bank ("FDIC-R"), for its Complaint, states as follows:

### I. INTRODUCTION

1.     FDIC-R brings this lawsuit in its capacity as Receiver for Mutual Bank ("Mutual Bank" or the "Bank") to recover over $115 million in losses the Bank suffered on twelve commercial real estate ("CRE") and acquisition, development, and construction ("ADC") loans (collectively, the "Loss Loans"), $10.5 million in unlawful dividend payments, and $1.09 million in wasted corporate assets.

2.     FDIC-R asserts claims against eight former directors ("Director Defendants") for gross negligence, negligence, and breach of fiduciary duty based on, *inter alia*: their approval of high-risk loans to uncreditworthy borrowers; their failure to supervise the Bank's lending activity and other operations; their approval of unlawful dividend payments; and corporate waste. All of

the Director Defendants were members of the Directors' Loan Committee ("DLC"), which was the Board of Directors' committee responsible for reviewing and approving the Loss Loans. One of the Director Defendants was a member of the Senior Officers' Loan Committee ("SOLC"), which was the management committee responsible for approving the Loss Loans.

3.     FDIC-R also asserts claims against two former officers ("Officer Defendants") for gross negligence, negligence, and breach of fiduciary duty based on the Officer Defendants' approval of high-risk loans to uncreditworthy borrowers as members of the SOLC.

4.     FDIC-R asserts claims against the Bank's attorney (who also is one of the Director Defendants) and his law firm, Regas, Frezadas & Dallas, LLP, (collectively, "Attorney Defendants") for legal malpractice, breach of fiduciary duty to the Bank, and aiding and abetting the Director Defendants' and Officer Defendants' breaches of fiduciary duty.

5.     Collectively, the Director Defendants and Officer Defendants ("Director and Officer Defendants"):  (a) recklessly implemented a strategy of rapid asset growth through approving a high concentration of risky CRE, ADC, and out-of-area loans to a small concentration of high-volume borrowers; (b) failed to implement appropriate underwriting and credit administration practices; (c) ignored the Bank's loan policies; (d) ignored federal lending regulations; a nd (e) disregarded warnings from the Bank's regulators regarding the Bank's lending activities.

6.     The Director Defendants also wasted corporate assets and drained the Bank's capital by: (a) approving $10.5 million in imprudent and unlawful dividend payments; (b) facilitating the payment of $250,000 from Bank funds for the extravagant wedding of Defendant Arun Veluchamy; (c) authorizing $495,000 in "bonuses" to pay for the criminal defense costs for the Defendant Amrish Mahajan's wife who had been indicted for Medicaid fraud; (d) approving

2

the use of $300,000 in Bank funds to hold a Board of Directors meeting in Monte Carlo; and (e) authorizing over $250,000 in excessive payments to contractors controlled by friends and relatives of certain Director Defendants.

7.      The Attorney Defendants breached their duties to their client, the Bank, by: (a) aiding and abetting the Defendants' reckless lending activity; (b) facilitating the unlawful payment of dividends; (c) failing to counsel and prevent the Board of Directors from making grossly imprudent loans; (d) ignoring federal lending regulations and warnings from Bank regulators to the detriment of their client, the Bank; and (e) facilitating Bank transactions with entities in which at least one of the Attorney Defendants held an interest, despite the obvious conflicts of interest posed by the transactions.

8.      On July 31, 2009, the Illinois Department of Financial and Professional Regulations ("IDFPR") closed Mutual Bank and appointed the FDIC as Receiver. The Bank failed with assets of $1.7 billion and a loss to the FDIC's Deposit Insurance Fund currently estimated at $775 million.

## II.      PARTIES

9.      The FDIC is a corporation organized and existing under the laws of the United States of America. 12 U.S.C. § 1811, *et seq*. The FDIC is an instrumentality of the United States of America and is charged with, among other things, the orderly liquidation of failed financial institutions. Pursuant to 12 U.S.C. § 1821(d)(2), the FDIC as Receiver succeeds to all of the rights, powers and privileges of the insured institution as well as the rights of any stockholder, member, account holder, depositor or officer or director with respect to the assets of the institution.

1916864-3

10.     Mutual Bank was a state-chartered, nonmember bank established by the IDFPR and insured by the FDIC. Mutual Bank was a wholly-owned subsidiary of First Mutual Bancorp of Illinois, Inc. ("Bancorp"). Mutual Bank operated ten branches in the Chicago area, one in Houston, Texas, one in Staten Island, New York, and one in Edison, New Jersey. Mutual's operations center was located in Homewood, Illinois.

11.     Pursuant to 12 U.S.C. § 1821d(2)(A)(i), the FDIC-R succeeded to all rights, titles, powers, and privileges of Mutual Bank and its shareholders including, but not limited to, claims against the Bank's former officers, directors and attorneys.

## INTERESTED PERSONS

12.     Pethinaidu Veluchamy was the Bank's Chairman of the twelve Board of Directors and a member of the DLC from 1998 to July 2009 and voted to approve each of the twelve Loss Loans, the unlawful dividend payments and the waste of the Bank's corporate assets. Mr. Veluchamy has filed a petition in the United States Bankruptcy Court for the Northern District of Illinois pursuant to Chapter 7 of Title 11 of the United States Code. Despite his culpability for the events described herein, the bankruptcy stay precludes naming him as a defendant unless the stay is modified or lifted.

13.     Parameswari Veluchamy is Pethinaidu Veluchamy's wife. She was a member of Mutual Bank's Board of Directors and of the DLC from 1998 to July 2009, and voted to approve each of the twelve Loss Loans, the unlawful dividend payments and the waste of the Bank's corporate assets. Mrs. Veluchamy has filed a petition in the United States Bankruptcy Court for the Northern District of Illinois pursuant to Chapter 7 of Title 11 of the United States Code. Despite her culpability for the events described herein, the bankruptcy stay precludes naming her as a defendant unless the stay is modified or lifted.

1916864-3

## DIRECTOR DEFENDANTS

14.     Amrish Mahajan ("Mahajan") was the Bank's President, Chief Operating Officer, and a member of Mutual's Board of Directors.  He also was a member of the SOLC and the DLC.  He served in these positions from 1998 to February 2009.  Mahajan owned 1.56% of the stock of Bancorp.  Majahan voted to approve each of the Loss Loans, the unlawful dividend payments and the waste of the Bank's corporate assets.

15.     Arun Veluchamy is Pethinaidu Veluchamy's son.  He was member of Mutual Bank's Board of Directors and of the DLC from 2001 to July 2009, and voted to approve each of the twelve Loss Loans, the unlawful dividend payments and the waste of the Bank's corporate assets.

16.     Anu Veluchamy is Pethinaidu Veluchamy's daughter.  She was a member of the Board of Directors and of the DLC from 2004 to July 2009, and voted to approve each of the twelve Loss Loans, the unlawful dividend payments and the waste of the Bank's corporate assets.

17.     Steven Lakner ("Lakner") was a member of Mutual Bank's Board of Directors and of the DLC from February 2004 to July 2009.  He voted to approve each of the twelve Loss Loans, the unlawful dividend payments and the waste of the Bank's corporate assets.

18.     Ronald Tucek ("Tucek") was a member of Mutual Bank's Board of Directors and of the DLC from February 2004 to March 2009.  He voted to approve each of the twelve Loss Loans, the unlawful dividend payments and the waste of the Bank's corporate assets.

19.     Patrick McCarthy ("McCarthy") was a member of Mutual Bank's Board of Directors and of the DLC from February 2004 to July 2009.  He voted to approve eleven of the

1916864-3

Loss Loans as set forth in ¶57, *infra* as well as the unlawful dividend payments and the waste of the Bank's corporate assets.

20.     Paul Pappageorge ("Pappageorge") was a member of the Bank's Board of Directors and of the DLC from March 2008 to July 2009. He voted to approve two of the Loss Loans as set forth in ¶57, *infra* as well as the unlawful dividend payment in 2008 and the waste of the Bank's corporate assets.

## OFFICER DEFENDANTS

21.     Thomas Pacocha ("Pacocha") was the Chief Credit Officer, Executive Vice President, and member of the SOLC from 2001 to 2009. As a member of the SOLC, he voted to approve eight of the Loss Loans as set forth in ¶57, *infra*.

22.     Richard Barth ("Barth") was a loan officer, senior vice president, and member of the SOLC from 2006 to 2009. As a member of the SOLC, he voted to approve six of the Loss Loans as set forth in ¶57, *infra*.

## ATTORNEY DEFENDANTS

23.     James Regas ("Regas") was Mutual Bank's General Counsel, a member of the Bank's Board of Directors, and a member of the DLC from 1990 to March 2009. James Regas was also a member of Regas, Frezados & Dallas LLP. He voted to approve each of the twelve Loss Loans, the unlawful dividend payments and the waste of the Bank's corporate assets.

24.     Regas, Frezados & Dallas LLP ("Regas Firm" or "the Firm"), along with Regas, was Mutual Bank's general counsel. The Regas Firm provided legal services to the Bank from June 2003 to July 2009. The Regas Firm and its attorneys represented the Bank on several of the Loss Loans.

1916864-3

### III.    JURISDICTION AND VENUE

25.    The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

26.    Venue is proper in this district under 28 U.S.C. § 1391(b).

27.    The Court has personal jurisdiction over Defendants under 735 ILCS § 5/2-209, *et seq.*

### IV.    FACTUAL BACKGROUND

#### A.    Lending Operations and Concentrations

28.    Beginning in 2004, the Bank rapidly grew its loan portfolio, primarily through CRE and ADC loans.  From 2005 to 2009, Mutual's total assets nearly doubled, from $898 million in 2005 to $1.65 billion in 2009.  This rapid growth, actively encouraged and facilitated by all of the Defendants, left the Bank dangerously exposed.

29.    Mutual Bank became heavily concentrated in ADC loans.  In 2007, its ADC loans represented 209% of total capital.  In 2008, this figure grew to 271%.  In March 2009, it ballooned to 819%.  By comparison, during this same period, peer group banks decreased their exposure to ADC loans.  In 2007, 2008, and 2009, the peer group banks held ADC loans representing 147%, 139%, and 129% of total capital.  Mutual Bank held an even more dangerous concentration of CRE loans.  In 2007, 2008, and 2009, CRE loans accounted for 415%, 576%, and 1855% of Mutual's total capital.  By comparison, in 2007, 2008, and 2009, peer group banks held CRE loans representing 302%, 307%, and 295% of total capital.

30.    Mutual Bank's loan portfolio was also overly concentrated in a small number of high-volume borrowers.  As of August 2007, Mutual had extended $294.2 million in loans to its fifteen largest borrowers.  By October of 2008, this figure swelled to $428.6 million.

7

31.     During this period of tremendous growth and intense concentration, Director Defendants failed to hire the necessary staff or implement prudent credit administration practices to keep pace with the growth of the Bank's loan portfolio.  As regulators repeatedly warned, the Bank's management practices and staffing were inadequate relative to the Bank's size, complexity, and risk-profile.  Rather than train and use its own underwriting staff, Defendants relied heavily on a small number of mortgage brokers to structure and facilitate many of the Bank's largest and riskiest loans.

32.     The Director and Officer Defendants failed to establish procedures that would have lessened the risks of the Bank's improvident lending practices.  The terms of transactions were not accurately documented.  Status reports were missing so that records of how an asset was progressing were not available.  Terms of loans were changed at closing without board or loan committee approvals or any record in the file.  Loan guarantees were frequently missing from the files.  Appraisers were retained by brokers with an interest in seeing transactions consummated, not by the Bank.  Appraisals were often received *after* the loan was funded. Loans were typically non-recourse and dependent on guarantor abilities to repay in the event that the collateral was insufficient.  Yet, little or no attention was paid to whether guarantors had sufficient liquidity to protect the Bank's interest; the officers and the Board did little or no analysis of guarantor or borrower financial strength.

33.     The Director and Officer Defendants also failed to ensure that Mutual Bank could generate timely and accurate financial reports.  Staff was unfamiliar with basic regulatory reporting standards.  There was no capacity to track loan concentrations or how particular types of loans were performing.  In June 2008, when requested by federal examiners to produce a summary of interest reserve loans, the Bank was unable to provide such documentation.  The

8

entire internal audit function of the institution was suspect; the Bank's ability to calculate accurate loan loss reserves was called into question as early as 2005. By 2008, even the Bank's own auditors despaired of the Bank being able to generate accurate numbers and declined to issue an opinion on management's financial statements.

34.     In his lawsuit against the Bank's auditors, Chairman of the Board Pethinaidu Veluchamy has acknowledged that "the Bank's balance sheet contained hundreds of millions of dollars in loans that had been funded on the basis of substandard, if not, reckless underwriting and . . . were not identified for corrective action because of critical failure in the Bank's internal credit risk review function."

## C.     Mutual's Loan Policy

35.     On paper, Mutual Bank maintained an extensive loan policy. The loan policy required diligent underwriting in conformity with state and federal law, close monitoring of concentrations of credit, rigorous documentation, and prudent evaluation of risk.

36.     Pursuant to the Bank's loan policy, individual lending officers were given specific limits on the dollar amount of loans they could approve. Loans in excess of individual officers' lending limits, but under $1 million required approval by the SOLC. Loans in excess of $1 million required approval by the DLC which consisted of each member of the Board.

37.     Defendants routinely ignored the Bank's loan policy requirements and did not enforce loan policy provisions.

## B.     Regulatory History

38.     Defendants were repeatedly warned by state and federal bank examiners of the significant weaknesses in Mutual Bank's lending practices. Defendants ignored these warnings.

1916864-3

## May 2005 Examination

39.     In May 2005, IDFPR conducted a state examination of Mutual Bank. The report of examination ("RoE") from the May 2005 examination was delivered to Mutual Bank's Board of Directors on June 10, 2005.

40.     The RoE warned that (a) "adversely classified items have significantly increased since the 2004 FDIC examination;" (b) "concentration limits for the gas station and hotel segments are considered high at 200% and 250% of capital, respectively;" (c) the Bank's hotel loans "carry more risk due to the fact that they are secured by special use properties and that performance is highly dependent on a strong economy;" and (d) "many of the credits were extended to buy distressed properties with cash flows based solely on projections." The May 2005 RoE also noted that many of the properties securing Mutual Bank's gas station/convenience store loans were "outside the banks [sic] immediate market area, making collateral monitoring difficult."

41.     As a result of the May 2005 examination, state regulators made several recommendations to enhance risk management practices. Defendants ignored these recommendations.

## May 2006 Examination

42.     In May 2006, the FDIC conducted an examination of Mutual Bank. The RoE from the May 2006 examination was delivered to the Bank's Board of Directors on July 19, 2006.

43.     In the May 2006 RoE, federal regulators again brought to the attention of the Board several serious problems. Regulators noted that "[r]isk management systems have not kept pace with the record asset growth experienced over the last two years" and that "credit

administration weaknesses are more pronounced as a result of the substantial loan growth without a corresponding increase in staffing."

44.   The report criticized the Bank's underwriting and credit administration practices based on inconsistencies in "global cash flow repayment analysis, officer credit memoranda, and documentation of interest reserves." Additionally, the May 2006 RoE stated: "Out of area credits inherently present heightened risk as the degree of control is reduced given the geographic dispersion, in addition to the type of construction and development projects pursued." The RoE also raised substantial concerns about asset quality.

45.   As a result of the May 2006 examination, regulators made several recommendations to enhance risk management practices.   Defendants ignored these recommendations.

**May 2007 Examination**

46.   In May 2007, the FDIC and IDFPR conducted a joint examination of Mutual Bank. The RoE from the May 2007 examination was delivered to Mutual's Board of Directors on June 27, 2007.

47.   The May 2007 RoE noted that the Bank's asset quality had deteriorated significantly and that the loan portfolio contained a "heightened level of risk due to lending outside the local market area and to economically sensitive industries." Regulators criticized the Bank's "aggressive growth plan" in high-risk areas such as the "hospitality and gas station/convenience store sectors." Importantly, the RoE noted that loans had been approved in reliance on "[q]uestionable and, at times, aggressive appraisals" for "out of area credits which deserve closer scrutiny by officers responsible for internal appraisal review." As with prior

11

examinations, the RoE also recognized continuing weaknesses in the Bank's underwriting and credit administration practices.

48.    As a result of the May 2007 examination, regulators made several recommendations to enhance risk management practices.    Defendants ignored these recommendations.

### June 2008 Examination

49.    In June 2008, the FDIC and IDFPR conducted a joint examination of Mutual Bank. The RoE from the June 2008 examination was delivered to Mutual's Board of Directors on July 30, 2008.

50.    The description of the Bank's practices was harsh.    The RoE noted that the Bank's financial condition was unsatisfactory, that management's risk management practices were unacceptable, and that "rapid deterioration in asset quality, primarily located within the loan portfolio, has crippled earnings, reduced capital levels, and exposed the bank to excessive amounts of risk." The RoE further stated that Mutual Bank's asset quality had deteriorated as a result of poor underwriting, concentration in CRE and ADC loans, out-of-area lending, and an aggressive, ill considered growth strategy. Regulators warned that the Board of Directors and senior management needed to "significantly improve risk monitoring and reporting practices, and take steps to ensure that adequate staffing exists to effectively manage operations." They also criticized management for credit administration practices that "presented an imminent threat to the institution's viability."

51.    Defendants ignored these warnings.    Remarkably, Defendants evidenced no interest in even discussing them with regulators.    While regulators invited members of the Board of Directors to participate in the 2008 examination exit interview to discuss the Bank's problems,

12

none of the Director Defendants did so. When Pethinaidu Veluchamy, as Chairman of the Board, was invited to attend a meeting with federal regulators to discuss the observations and criticisms of the RoE, he refused to attend.

52.     As a result of the findings from the June 2008 RoE, Mutual Bank entered into a Cease and Desist Order with the FDIC and IDFPR, effective January 9, 2009.

**January 2009 Visitation**

53.     On January 2009, FDIC examiners conducted a visitation to evaluate the asset quality and operations of the Bank as of December 31, 2008.

54.     The summary of the January 2009 visitation noted that the Bank's financial condition had "continued to deteriorate to the point where future viability of the institution is now in question." Regulators noted that there had been no improvement "in management's ability to properly identify, quantify, and reserve for the risk inherent in the [Bank's] balance sheet." Despite regulators' prior, repeated warnings, the January 2009 visitation demonstrated that senior management and the Board of Directors had shown an inability to "implement appropriate risk management practices."

55.     The extensive regulatory criticism of the Bank's operations from 2005 to 2009 had little or no effect. Despite sharp criticisms of uncontrolled asset growth, poor underwriting and poor credit administration, $81 million in high risk, poorly underwritten loans were made *after* March 2008 and the collapse of the real estate market.

56.     As a result of Defendants' failure to correct the deficiencies repeatedly identified and described by regulators, the IDFPR closed Mutual on July 31, 2009.

**D.      The Twelve Loss Loans**

57.     The loans made and approved by the Director and Officer Defendants caused

13

significant injury to the Bank. The following table lists twelve such Loss Loans and identifies specifically which of the officers and directors voted to approve each loan.

| Borrower | AM[1] | PeV | PaV | ArV | AnV | SL | RT | PM | JR | PP | RB | TP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shubh Hotels Detroit | X | X | X | X | X | X | X | X | X | | X | X |
| Muer Management | X | X | X | X | X | X | X | X | X | | X | X |
| Shubh Hotels Boca | X | X | X | X | X | X | X | | X | | X | X |
| Tel-Land LLC | X | X | X | X | X | X | X | X | X | | | |
| Urban Retail Prop.-A | X | X | X | X | X | X | X | X | X | | | |
| Urban Retail Prop.-B | X | X | X | X | X | X | X | X | X | X | | X |
| Lite View Unlim. | X | X | X | X | X | X | X | X | X | | X | X |
| Standard Prop Dev | X | X | X | X | X | X | X | X | X | | X | X |
| ANZ Enterprises | X | X | X | X | X | X | X | X | X | | X | X |
| R&B Land Grantline | X | X | X | X | X | X | X | X | X | | | |
| Morgan Terrace II | X | X | X | X | X | X | X | X | X | | | |
| Venter & Assoc. | X | X | X | X | X | X | X | X | X | X (modification) | | X (modification) |

58. With regard to these Loss Loans, Defendants routinely failed to assess the repayment abilities of borrowers and guarantors, relied excessively on loan brokers who brought high risk transactions to the Bank, violated the Bank's loan policies, allowed use of interest reserves without adequately considering borrowers' repayment abilities, made loans out-of-area without sufficient staff to monitor performance, failed to monitor the use of loan funds, renewed loans without adequate underwriting or obtaining additional security. The Loss Loans were made in violation of the general safety and soundness standards of 12 C.F.R. §364.101,

---

[1] The abbreviations used in this chart are as follows: AM = Mahajan; PeV = Pethinaidu; PaV = Parameswari; ArV = Arun; AnV = Anu; SL = Lakner; RT = Tucek; PM = McCarthy; JR = Regas; PP = Pappageorge; RB = Barth; TP = Pacocha.

14

Appendix A, the general underwriting standards of 12 C.F.R. §364.101, Appendix A and the real estate lending standards of 12 C.F.R. §365.2, Appendix A.

59.     The indiscriminate use of interest reserves funded by loan proceeds for certain of the Loss Loans gave the appearance that the loans were performing when, in fact, the funds came only from the Bank. Few, if any, of these borrowers or guarantors ever contributed any of their own funds to reduce the debt or meet interest obligations. The risk associated with these transactions was borne almost entirely by the Bank.

60.     Much of this lending occurred after the real estate market began its precipitous decline in late 2006. Loan files, however, seldom discussed market conditions other than by casual reference. As other lending institutions pressured borrowers to remediate or dispose of the risk of default, the borrowers turned to Mutual Bank which, in many instances, became, the lender of last resort for failed real estate projects.

61.     The losses from the twelve Loss Loans total approximately $115.4 million. They are summarized below.

**Muer Management**

62.     In March 2008, Defendant members of the DLC and SOLC approved a $12.15 million non-recourse, interest-only loan to Muer Management based on a loan presentation prepared by Pacocha working closely with the loan's broker, Harry Shah. Payments were to be made from an interest reserve funded by the loan itself. The guarantors were Mayank Ray, Harshad Patel, Dipak Goswami, Bhupen Patel and Hitesh Patel.

63.     The loan had numerous deficiencies, including but not limited to, the following:

    a.    The property securing the loan was a New Jersey hotel that was subject to foreclosure proceedings and subject to mechanics and tax liens rendering the chances of any repayment very slim. Had Defendants caused any

reasonable due diligence to be completed, they would have discovered that the property was in financial distress.

b.     Defendants failed to require prudent underwriting. The loan file contains no analysis of the borrowers or the guarantors' ability to repay the loan.

c.     The loan was rushed through the approval process. A majority of the Board approved the loan without holding a meeting to discuss the loan. The loan was actually funded prior to proper approvals by either the DLC or SOLC in violation of the Bank's loan policy.

d.     In making this loan, Defendants ignored numerous regulatory warnings of over-concentration in hotel loans and its substandard underwriting on such transactions.

e.     Defendants caused the loan to be made after the commercial real estate market began its decline and collateral values had plummeted.

64.     Upon depletion of the loan's interest reserve, the borrower defaulted on the loan. No effort was made by any of the Defendants to pursue the guarantors or the loan broker.

65.     The Bank sustained estimated damages of $6.44 million plus accrued interest on this loan.

### Shubh Hotels Boca, LLC

66.     In February 2008, Defendant members of the DLC and SOLC unanimously approved a $28,800,000 loan to Shubh Hotels Boca, LLC to refinance and renovate a Double Tree Guest Suites in Boca Raton, Florida. The loan was guaranteed by Atul Bisaria.

67.     The loan had numerous deficiencies, including but not limited to, the following:

a.     Approximately $20,000,000 from the loan was used to refinance a prior loan that was already in default. No additional collateral was obtained; no justification for this risk appears in the SOLC or DLC minutes. Interest payments were funded by an interest reserve created from the loan proceeds which made it appear that the loan was performing when, in reality, there was little chance of repayment.

b.     At the time of the loan, the borrower had not received required permits from the city of Boca Raton, which precluded the project from proceeding as scheduled. Due diligence should have revealed the lack of city permits;

16

Defendants should not have allowed funds to be extended without ensuring that the project could proceed with City approval.

c.    The funds were dispersed prior to any approval by either the DLC or the SOLC in violation of the Bank's loan policy.

d.    In making this loan, Defendants ignored numerous prior regulatory warnings of over-concentration in hotel and out-of-area loans and the poor underwriting and lack of due diligence in the Bank's lending operations.

e.    Defendants failed to monitor and supervise the loan. In March 2008, the Bank disbursed a construction draw in the amount of $1,525,887.53, purportedly for the borrower's purchase of steel. In fact, no such steel was delivered and the purchase contract appears to have been a sham. Prudent supervision would have detected these errors and prevented the wrongful disbursement of funds.

f.    Defendants allowed Bank funds to be disbursed even after the interest reserve was exhausted without obtaining any additional protection for the Bank.

g.    Defendants allowed the loan to be extended despite the borrower's default. In March 2009, the SOLC approved a 90-day extension of the loan note without additional collateral or other protection for the Bank. In April 2009, the SOLC renewed the loan at a decreased interest rate, retroactive to February 2009.

h.    Defendants caused the loan to be made after the commercial real estate market began its decline and collateral values had plummeted.

68.    Notwithstanding the default, no effort was made by any of the Defendants to pursue the guarantor.

69.    The Bank sustained estimated damages of $16.17 million plus accrued interest on this loan.

**Shubh Hotels Detroit, LLC**

70.    In March 2008, Defendant members of the DLC and SOLC unanimously approved a $29,700,000 loan to Shubh Hotels Detroit, LLC to refinance the Sheraton Riverside hotel in Detroit, Michigan. $25,722,105 in loan proceeds were used to refinance a prior loan that

17

was already deeply troubled. The loan was guaranteed by Atul Bisaria (for $2 million) and Mihu Bisaria (for the full obligation).

71. The loan had numerous deficiencies, including but not limited to, the following:

    a.     The borrower's 2008 operating statements showed a significant decline in revenues, which should have raised concerns as to whether the borrower could service the loan. No effort was made to assess the guarantors' ability to cover any default or deficiency.

    b.     Virtually no other due diligence was performed. The Bank relied on the loan broker Harry Shah for its evaluations of the transaction rather than the Bank's staff. Indeed, rather than obtain an appraisal on Bank's pre-approved appraiser list, Shah was allowed to choose an appraisal firm he favored. Defendants did not require the approval of this appraiser as required by the Bank's loan policy nor did they conduct a review of this appraisal.

    c.     Defendants ignored numerous regulatory warnings of over-concentration in hotel and out-of-area loans and poor underwriting practices and the absence of due diligence.

    d.     Defendants allowed additional concessions to the borrower even after the loan defaulted. After the loan reserves were depleted, several additional interest payments were funded from a Bank escrow account with Pethinaidu's Veluchamy's authorization. Despite the loan's delinquency and the depletion of interest reserves, in March 2009, the loan's interest rate was decreased, retroactive to February 8, 2009.

    e.     Defendants caused the loan to be made after the commercial real estate market began its decline and collateral values had plummeted.

72. Notwithstanding default, no effort was made by any of the Defendants to pursue the guarantors or the loan broker.

73. The Bank sustained estimated damages of $21.72 million plus accrued interest on this loan.

### Tel-Land LLC

74. In December 2007, Defendant members of the DLC unanimously approved a $16 million loan to Tel-Land LLC and Mi-Holiday LLC for the conversion of a Holiday Inn to a

18

Wyndham Hotel. The loan was guaranteed by Orang Joobeen.

75. The loan had numerous deficiencies, including but not limited to, the following:

    a.     Defendants failed to conduct adequate due diligence. The property was already in a distressed condition at the time the loan was approved. The majority of the loan proceeds were used to pay a prior loan that was already deeply troubled. No effort was made to protect the Bank from this risk.

    b.     Pethinaidu Veluchamy failed to disclose that his brother held a 50% ownership interest in the borrower. Shortly before the IDFPR's closure of Mutual Bank, a memo was added to the loan file wrongly claiming that Mr. Veluchamy was not aware of his brother's interest. Veluchamy was, in fact, aware of his brother's interest before the loan was approved.

    c.     Defendants' decision to make the loan ignored numerous regulatory warnings of over-concentration in hotel and out-of-area loans and poor underwriting practices.

    d.     After the borrowers defaulted on the loan and failed to complete the proposed hotel renovations, the interest reserve was extended to May 18, 2009. No additional protection from the risk of default was obtained.

    e.     Defendants caused the loan to be made after the commercial real estate market began its decline.

76. Notwithstanding default, no effort was made by any of the Defendants to pursue the guarantor on the loan.

77. The Bank sustained estimated damages of $11.72 million plus accrued interest on this loan.

### Lite View Unlimited, LLC

78. In June 2007, Defendant members of the DLC and SOLC unanimously approved a $1.7 million loan to Lite View Unlimited, LLC to refinance a Travelodge motel in Louisville, Kentucky. The loan was guaranteed by Chiman Rai and his wife, Vimla Rai. The majority of the loan proceeds were to be used to pay off two promissory notes that had defaulted or were about to default. The remainder was to be used for working capital for the motel renovations.

19

79. The loan had numerous deficiencies, including but not limited to, the following:

    a. The loan was approved without obtaining complete financial information from the borrowers or any effort to establish whether the guarantors could cover the loan in the event of a borrower default.

    b. When the loan was originated, the borrower's principal and one of its guarantors, Chiman Rai, was in custody awaiting trial for murder of his daughter-in-law. Defendants apparently did not inquire as to Mr. Rai's whereabouts despite the fact that loan documents were signed by his wife. The minutes of the DLC failed to include information about Mr. Rai's arrest or describe how a guarantor incarcerated on murder charges would be able to pay down the loan.

    c. The DLC approved the loan on June 27, 2007, the same day the Director Defendants received the May 2007 RoE, which warned the Bank about its over-concentration in hotel and out-of-area loans and the risks of poor underwriting.

80. The borrower defaulted when the loan came due. No effort was made by any of the Defendants to pursue the guarantors.

81. Mutual Bank sustained estimated damages of $571,886 plus accrued interest on this loan.

### Urban Retail Properties

82. In June 2007, Defendant members of the DLC granted a 90-day, $7.8 million line of credit to Urban Retail Properties to pay down a bridge loan and provide for the borrower's working capital. The loan was guaranteed by Ross Glickman and Len Tobaski.

83. The loan had numerous deficiencies, including but not limited to, the following:

    a. The borrower had consistently incurred operating losses; the loan guarantors had limited personal cash flow and liquid assets, making repayment unlikely. The borrower was in financial distress, causing it to drastically reduce office space and employee payroll.

    b. Defendants disregarded the Bank's loan policy which required that working capital loans be made only to companies that were "operating profitably with a sound financial condition, desiring funds for peak requirements during its normal business cycle."

20

    c.      Defendants failed to require adequate security for the loan. This was in essence, an unsecured loan because the properties securing the loan were subject to significant pre-existing mortgages.

    d.      Defendants allowed concessions to the borrower even after default. On October 31, 2007, Defendant members of the DLC unanimously approved a one-year loan extension without obtaining any additional protection for the Bank.

84.    In June 2008, Defendant members of the DLC and SOLC unanimously approved a reduction in Urban Retail Properties's line of credit to $2.5 million and granted the borrower a $7.5 million, two-year term loan.

85.    This modification of Urban Retail Properties lending relationship had numerous deficiencies, including but not limited to, the following:

    a.      The original underwriting and due diligence failures remained unremedied. The borrower's operating losses and the loan guarantors' limited personal cash flow and limited liquid assets, continued to render repayment unlikely. The borrower's ability to pay off the loan had become entirely contingent on a proposed joint venture with a third party, which had not yet been finalized. The borrower forecasted additional losses and negative cash flow in 2008.

    b.      The modification was funded prior to obtaining approval from the DLC in violation of the Bank's loan policy. On June 18, 2008, after the loan was funded, the DLC unanimously ratified the loan.

86.    Shortly after the modification was funded, the borrower defaulted on the loan. No effort was made by any of the Defendants to pursue the guarantors.

87.    The Bank sustained estimated damages of $7.47 million plus accrued interest on the initial loan and the modification.

**Standard Property Development LLC**

88.    In December 2006, Defendant members of the DLC and SOLC unanimously approved a $23,000,000 construction line of credit to Standard Property Development LLC and

21

George Venturella for the rehabilitation and development of a hotel and spa in Orlando, Florida. The loan was structured as an 18-month, non-revolving line of credit with interest-only payments funded from an interest reserve for the first six months. The loan was guaranteed by George Venturella, Steve Parmee and GV Designer Homes, a Venturella controlled entity.

89.    The loan had numerous deficiencies, including but not limited to, the following:

a.    Defendants failed to require prudent underwriting. Mr. Venturella had extensive loans at other institutions, most of which were secured by troubled projects. The ability of the guarantors to pay down the loan was highly suspect.

b.    Defendants failed to ensure that loan funds were being used for their intended purposes. Frequently, monies were paid directly to Mr. Venturella rather than the borrower or the construction escrow or the contractors. As a result, contractors went unpaid and the property became subject to approximately $4.5 million in construction liens. Defendants failed to ensure that the project was monitored and properly supervised.

c.    Defendants ignored regulatory warnings of out-of area lending and concentration in loans to the hotel industry.

d.    In March 2008, Defendant members of the DLC and SOLC approved a $1.5 million increase in the loan without requiring additional collateral or other protections for the Bank.

90.    In late 2008, hotel construction was halted with only 60% of work completed. Defendants did not obtain an accounting of how the Bank's funds had been spent despite clear indications of misapplication of funds.

91.    In January 2009, the Bank accepted a deed in lieu of foreclosure from Mr. Venturella. The Bank later transferred the property to an entity owned jointly by Venturella and the Bank. The manager of the entity to whom the property was transferred was Sonia Veluchamy, the daughter-in-law of Board chairman Pethinaidu Veluchamy. No effort was made by any of the Defendants to pursue the guarantors.

22

92.     The Bank sustained estimated damages of $13.76 million plus accrued interest on this loan.

## ANZ Enterprises

93.     In August 2006, Defendant members of the DLC and SOLC unanimously approved a $4,800,000 loan to ANZ Enterprises, Inc. to purchase a Super 8 Hotel in Franklin Park, Illinois. The loan was guaranteed by Nikhat Ali and Mohammed Ali.

94.     Defendants approved the loan without any inquiry into the financial condition or status of the guarantors. This was a serious deficiency. The guarantees were essential to ensure that there would be an adequate source for repayment of the loan in the event of default. The guarantees were illusory. The guarantors for the loan have alleged that the signatures on their guarantees were forged and that they never provided guarantees in connection with the transaction. Upon the borrower's default, the Bank initiated foreclosure proceedings but did not pursue the guarantors.

95.     The Bank sustained estimated damages of $1.34 million plus accrued interest on this loan.

## R&B Land Grantline

96.     In April 2006, Defendant members of the DLC and SOLC approved the acquisition of a $24,500,000 participation interest in a $28,500,000 loan to R.B. Land Investments, LLC (now R&B Land Grantline). Western Springs National Bank and Trust ("Western Springs") retained a $4,000,000 participation interest in the loan. The funds were used to purchase a 50% interest in approximately 220 acres of undeveloped land outside of Sacramento, California. The loan was guaranteed by Christo Bardis and John Reynan.

1916864-3

97.    The loan had numerous deficiencies, including but not limited to, the following:

    a.    Defendants failed to conduct any adequate due diligence. The future of the project was highly uncertain. The property securing the loan had no water lines or sewer system, and the project would take years of effort to complete. The complex permitting process had not been initiated. Its outcome was uncertain. The loan was a grossly negligent speculative bet on raw land.

    b.    Five days prior to funding, the DLC signed the loan presentation without holding a formal committee meeting. The DLC did not formally approve the loan until after it had been funded in violation of the Bank's loan policy.

    c.    The loan was approved despite serious conflicts of interest. Defendant Director Regas was the Chairman of Western Springs, from which Mutual purchased its participation interest. He also had a business relationship and personal friendship with the seller of the property. Despite these conflicts of interest, Regas did not abstain from voting to approve the loan.

    d.    In April 2008, despite the borrower's previous delinquent payments and without requiring updated financial information, Defendants approved the renewal of the loan.

98.    Notwithstanding default, no effort was made by any of the Defendants to pursue the guarantors.

99.    The Bank sustained estimated damages of $24.5 million plus accrued interest on this loan.

### Venter & Associates

100.    In June 2005, Defendant members of the DLC approved a $10,500,000 loan to Venter & Associates for the construction and renovation of a 98-unit apartment building in Chicago, Illinois. The loan was guaranteed by Ilie Venter.

101.    The loan had numerous deficiencies, including but not limited to, the following:

    a.    The loan was funded prior to obtaining requisite approval from the DLC and SOLC in violation of the Bank's loan policy.

24

b. Defendants failed to conduct adequate due diligence or appropriate underwriting. The borrower had insufficient resources to complete the project.

c. Less than a year after the loan was originated, federal regulators classified the loan as "substandard." Despite this obvious danger signal, Defendant members of the DLC approved a renewal and increase of funds in June 2006. In May 2008, the SOLC and DLC approved an additional increase that raised the total loan amount to $15,600,000 despite the substandard status of the loan and the collapse of the real estate market.

d. There was no proper monitoring and supervision of the loan. Construction funds were disbursed to the borrower and its guarantor rather than being paid directly to contractors or a proper escrow. Despite indications of misapplication of funds, Defendants did not obtain an audit or otherwise investigate the outflow of funds.

e. The Bank did not receive an updated appraisal of the property before extending additional funds. After construction funds were depleted, Defendants extended additional funds without requiring an updated assessment of the market conditions for the property.

102. Despite defaults, no effort was made by any of the Defendant to pursue the guarantor.

103. The Bank sustained estimated damages of $9,106,824 plus accrued interest on this loan.

### Morgan Terrace II, LLC

104. In May 2005, Defendant members of the DLC approved a set of transactions that would make funds available to Muslim customers by enabling them to avoid the payment of interest. To avoid interest payments, the Bank provided subsidiaries with funds to acquire the properties, which the borrower then "leased" in a sale/lease back transaction.

105. On September 8, 2005, the Bank through its subsidiary, entered into a sale/lease back transaction with Morgan Terrace II, LLC. The property acquired through this transaction was a 36-unit condominium complex in Chicago, Illinois.

1916864-3

106.     Morgan Terrace sale/lease back transaction had numerous deficiencies, including but not limited to, the following:

a.     Neither the Board of Directors nor the SOLC reviewed the details of the transaction. The Bank's subsidiary paid $8.5 million for the property despite an "as is" appraisal value of only $2.9 million.

b.     Defendants failed to exercise proper oversight of the transaction or monitor lease payments or otherwise ensure that funds were being used as promised. No audits were ever performed; no site visits conducted.

c.     Morgan Terrace II was owned and managed by Sunrise Management II ("Sunrise") whose principals also guaranteed the lease payments. Sunrise and its principals were a deeply troubled group with severe financial problems. Sunrise and its principals were subsequently indicted for securities fraud and have now fled the United States.

d.     Despite an abundance of warning signs and the collapse of the real estate market, the Bank extended another $8.3 million and $3.5 million for the property in 2006 and 2008.

107.     In September 2008, the guarantors defaulted on the lease payments. No effort was made by any of the Defendants to pursue the guarantors.

108.     The Bank sustained estimated damages of $2.5 million plus accrued interest on this loan.

## F.     Director Defendants Permitted Wasting of Corporate Assets

109.     The Director and Officer Defendants repeatedly drained the Bank's capital by using Bank funds for personal expenses.

110.     For example, on June 18, 2008, the Director Defendants unanimously approved a $250,000 payment for "sponsorship for the July 12, 2008 Mutual Bank function." This "Mutual Bank function" was actually Arun Veluchamy's wedding, which took place July 12, 2008. The wedding was a luxurious affair at the Chicago Sheraton Hotel with catered food, luxury

26

transportation, and entertainment. Selected parties were chauffeured to the event in rented Rolls Royces. All of this was paid for with Bank funds.

111. The Director Defendants also allowed Bank funds to be used to make payments to Mahajan for his wife's defense of a criminal case. In the Spring of 2007, Mahajan's wife was indicted for submitting false claims for reimbursement to Illinois Medicaid authorities. In order to defray the costs of her defense, Mahajan arranged a series of "advances" or "bonuses" to himself, which were then used to pay for his wife's defense of the criminal case. These payments, totaling over $495,000, were approved by the Director Defendants. When these payments were caught by federal regulators, Mahajan returned $202,560 with a loan from the Bank's holding company. The remaining $292,440 was unpaid.

112. The Director Defendants approved substantial payments to relatives and friends for renovations to the Bank's offices in Homewood, Illinois and Staten Island, New York. In early 2008, Regas and Mahajan awarded contracts for the renovation work, which were approved by the Board. The costs incurred for these renovations exceeded the value of the improvements by approximately $250,000.

113. The Director Defendants also permitted Bank funds to be used for travel expenses associated with a Board of Directors meeting in Monte Carlo. The Board of Directors did not need to hold this meeting abroad and there is no indication from the Board of Directors' meeting minutes that there was any business-related function that required travel to Monte Carlo. The cost of this travel to the Bank was approximately $300,000.

## G. **Improper Dividend Payments**

114. In the approving and making of dividend payments, the directors and officers of a bank are subject to the fiduciary duty of care and negligence standards that govern their conduct

generally. They must evaluate such payments as they would any other major transaction. Additionally, directors and officers owe their bank a duty of loyalty. That duty requires a director or officer to protect the bank's interests, and to avoid furthering their private interests at the expense of the bank. Directors and officers are not permitted to use their positions to profit personally at their bank's expense.

115. Further, Illinois law restricts the payments of dividends to institutions in a state of financial good health. "No dividend shall be paid by a state bank while it continues its banking business to an amount greater than its net profits then on hand, deducting first therefrom its losses and bad debt." 205 ILCS 5/14.8(b).

116. In 2007 and 2008, the Board of Directors of Mutual Bank approved $10.5 million in dividend payments to the Bank holding company which, in turn, paid out the dividends to shareholders. Over 95% of the shares of the holding company were held by Pethinaidu, Parameswari, Anu and Arun Veluchamy. The Veluchamys were the principal beneficiaries of the $10.5 million dividend payments. Defendant Mahajan received a smaller share.

117. In each instance, the Bank's Board of Directors, including the Veluchamys and Mahajan, authorized the payments with no inquiry or discussion into the propriety or lawfulness of the payments or any consideration of its impact on the financial condition of the Bank. Approving $10.5 million in dividends to the Veluchamy family and Mahajan at a time when Mutual Bank was in poor financial condition and in need of conserving its capital base was a gross violation of the Director Defendants' duty of care and loyalty.

118. Additionally, the payments violated Illinois law. The Bank's bad debt coupled with insufficient loss reserves and over-stated income meant that the dividends in 2007 and 2008 were greater than "the Bank's net profits then on-hand deducting first therefrom its losses and

1916864-3

bad debt." 205 ILCS 5/14.8(b). None of the Director Defendants evaluated the dividend payments in light of the limits imposed by Illinois law.

119. As holding company shareholders, the Veluchamy and Mahajan's receipt of these funds was precisely the kind of self-dealing that the duty of loyalty forbids. In effect, these Defendants looted the Bank when it was in a highly vulnerable state.

**H.** **The Attorney Defendants Failed to Counsel the Bank Properly**

120. The Defendant James Regas owed a fiduciary duty to Mutual Bank both in his role as a Director and as the Bank's principal legal counsel.

121. Regas was an active participant with the law firm bearing his name: Regas, Frezados & Dallas LLP. The Firm performed a broad array of tasks as counsel for the Bank. In addition to representing the Bank in specific loan transactions, Regas and the Firm also served at the Board of Directors level, as the Bank's general counsel. Regas counseled the Bank regarding regulatory compliance; Regas reviewed the grossly deficient loans presented to the Board and knew or should have known of the risks they imposed on his client; Regas actively participated in discussions with state and federal regulators and was fully aware of the gross misconduct of the Bank's officers and the risk to which they exposed the Bank. Despite knowledge of the gross imprudence and, in some cases, unlawful nature of these transactions, Regas and the Firm repeatedly failed to protect their client from the foreseeable injury inherent in these transactions.

122. Between January 2007 and April 2009, the Bank paid the Regas Firm a total of $3,094,194 for its legal services.

## Failure to Protect The Bank from the Catastrophic 2008 Loan Losses

123. By early 2008, the real estate market was in serious decline. Property values had precipitously dropped, and the hotel construction industry was in distress. At the same time, regulatory authorities had repeatedly warned the Defendants, including Regas, of the dangers associated with the Bank's concentration in out-of-area projects; its poor underwriting practices; its inability or unwillingness to actively monitor and control large transactions and its over-concentration in the hotel industry.

124. Despite these warnings, Regas and the Firm actively facilitated, as counsel, three massive loans to hotel developers that Regas and the Firm knew or should have known would inflict huge losses on the Bank. These transactions included: (a) a February 8, 2008, $28.8 million loan to Shubh Hotels Boca, LLC; (b) an April 23, 2008, $29.7 million loan to Shubh Hotels Detroit, LLC; and (c) a March 17, 2008, $12.15 million loan to Muer Management. The Firm counseled the Bank and prepared commitment letters and loan closing documents for all three transactions. Regas himself approved each of the loans.

125. The properties securing the loans were severely distressed, imposing on the Bank an unacceptable risk of nonpayment, a fact that Regas and the Firm knew or should have known. The underwriting of the loans made it clear that these were very high risk transactions with little protection for the Bank. As the firm responsible for closing these three large transactions, Regas and the Firm knew that extending funds to these borrowers was grossly imprudent, especially in light of warnings from regulators.

126. Nonetheless, the Regas Firm proceeded to closing without advising the Bank of the risks associated with these transactions, without ensuring that the transactions were adequately underwritten, and without requiring any significant due diligence. Regas and the

30

Firm took no steps to protect the Bank from these transactions and from the misconduct of its officers and directors.

127.    Had Regas and the Regas Firm advised the Bank against undertaking these risks or counseled the Bank to ensure the transactions were supported by prudent underwriting and due diligence or otherwise protected the Bank, the Bank would not have entered into these transactions.

128.    The losses on these three transactions exceed $44 million.

### Conflicts of Interest and the R.B. Land Investments' Loan

129.    In addition to his responsibilities at Mutual Bank, Regas was also an owner and Chairman of the Board of Western Springs National Bank and Trust ("Western Springs").

130.    On April 24, 2006 at the urging of Regas and others, Western Springs made a highly speculative $28.5 million loan to R.B. Land Investments (now R&B Land Grantline) to purchase 220 acres of raw land in California. This was a grossly imprudent bet on raw land with no infrastructure in place and a long and difficult permitting process. The seller of the land, however, Angelo Tsakopoulos, was Regas's close friend and business colleague. And so the transaction was quickly consummated despite its imprudence.

131.    Immediately after Western Springs made the loan, Regas arranged for the sale of a $24.5 million participation interest to Mutual Bank, thereby shifting the burden of risk to Mutual Bank.

132.    As a member of the DLC, Regas was able to shepherd the loan through the Bank's approval process. Regas did not abstain from voting to approve the sale of a participation interest to the Bank. Nor did Regas advise Mutual Bank of the grave risk of this transaction, of which he was fully aware.

31

133. Despite his fiduciary responsibilities as counsel to the Bank and a member of the Board of Directors, he abandoned his duty of loyalty to Mutual Bank in favor of Western Springs and Mr. Tsakopoulos. Despite his fiduciary duty as counsel to advise the Bank of risk and undertake his best efforts to protect the Bank, Regas did not do so. Had he done so, the Bank would not have entered into this transaction.

134. The loss to Mutual Bank from the R.B. Land Investments' transaction was approximately $24.5 million.

### Facilitating the Unlawful Payment of Dividends

135. As an attorney, Regas knew or should have known that Illinois law forbids the payment of dividends in an amount greater than net profits then on-hand after first subtracting losses and bad debts. *See* 205 ILCS 5/14.8(b). By 2007, it was clear that the Bank's financial condition did not permit the payment of dividends. Nonetheless, in 2007 and 2008, the Director Defendants approved $10.5 million in unlawful dividend payments.

136. Regas took no steps to advise himself of the reach of the law and failed to advise the Board of Directors that payment of dividends was unlawful. Worse, Regas actively supported the unlawful payments by voting to approve them. This was a breach of his duty to protect the Bank from the misconduct of its officers and directors.

137. Had Regas counseled the Bank that the dividend payments were unlawful under Illinois law and placed the Bank in financial jeopardy, the Board of Directors would not have approved the payments.

138. The loss to the Bank of this malpractice was $10.5 million plus accrued interest.

## V.    CLAIMS FOR RELIEF

### COUNT I
### GROSS NEGLIGENCE CLAIMS AGAINST
### DIRECTOR AND OFFICER DEFENDANTS FOR APPROVING LOSS LOANS

139.    FDIC-R realleges and incorporates by reference the allegations contained in paragraphs 1 through 138.

140.    The Director Defendants were members of the DLC and Mutual Bank's Board of Directors.  The Officer Defendants were members of the SOLC and were officers of Mutual Bank.

141.    Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") holds directors and officers of financial institutions personally liable for loss or damage caused by their "gross negligence," as defined by applicable state law.

142.    The Director and Officer Defendants owed Mutual Bank a duty to use reasonable care, skill, and diligence in the performance of their duties, including, but not limited to:  (a) conducting proper due diligence on proposed loans and the risks such loans posed to the Bank before approving them; (b) complying with the Bank's loan policies; (c) ensuring that any loans they approved were underwritten in a safe and sound manner; (d) ensuring that any loans they approved were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank; (e) ensuring that any loans they approved did not violate applicable banking laws and regulations; and (f) ensuring that any loans they approved did not create unsafe and unsound concentrations of credit.

143.    The Director and Officer Defendants breached their duties and were grossly negligent by, among other things:  (a) failing to conduct proper due diligence on the Loss Loans and the risks the Loss Loans posed to the Bank before approving them; (b) disregarding the

1916864-3

Bank's loan policies and approving the Loss Loans on terms that violated the Bank's loan policies; (c) failing to ensure that the Loss Loans were underwritten in a safe and sound manner; (d) failing to ensure that the Loss Loans were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank; (e) failing to ensure that the Loss Loans did not violate applicable banking laws and regulations; (f) failing to ensure that the Loss Loans did not create unsafe and unsound concentrations of credit; and (g) ignoring regulatory warnings about the Bank's lending operations. Additionally, the Defendants failed to staff the Bank's lending operations properly despite evident deficiencies and failed to supervise the lending operations of the Bank despite being advised of lending deficiencies.

144.    The Director and Officer Defendants knew or should have known of the risk associated with the Loss Loans and the Bank's deficient practices but nonetheless recklessly undertook these transactions. This was very great or gross negligence.

145.    As a direct and proximate cause of the gross negligence of the Director and Officer Defendants, the Bank suffered damages in excess of $115 million.

**COUNT II**
**BREACH OF THE FIDUCIARY DUTY OF CARE CLAIMS**
**AGAINST DIRECTOR AND OFFICER DEFENDANTS**
**FOR APPROVING THE LOSS LOANS**

146.    FDIC-R realleges and incorporates by reference the allegations contained in paragraphs 1 through 138.

147.    The Director Defendants were members of the DLC and Mutual Bank's Board of Directors. The Officer Defendants were members of the SOLC and were officers of Mutual Bank. As such the Director and Officer Defendants were fiduciaries of the Bank.

148.    The Director and Officer Defendants owed Mutual Bank fiduciary duties to exercise the utmost care, skill and diligence in the performance of their responsibilities,

34

including: (a) conducting proper due diligence on proposed loans and the risks such loans posed to the Bank before approving them; (b) approving only those loans that conformed with the Bank's loan policies; (c) ensuring that any loans they approved were underwritten in a safe and sound manner; (d) ensuring that any loans they approved were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank; (e) ensuring that any loans they approved did not violate applicable banking laws and regulations; and (f) ensuring that any loans they approved did not create unsafe and unsound concentrations of credit.

149.    The Director and Officer Defendants breached their fiduciary duties by, among other things: (a) failing to conduct proper due diligence on the Loss Loans and the risks the Loss Loans posed to the Bank before they approved them; (b) approving the Loss Loans on terms that violated the Bank's loan policies; (c) failing to ensure that the Loss Loans were underwritten in a safe and sound manner; (d) failing to ensure that the Loss Loans were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank; (e) failing to ensure that the Loss Loans did not violate applicable banking laws and regulations; (f) failing to ensure that the Loss Loans did not create unsafe and unsound concentrations of credit; and (g) ignoring regulatory warnings about the Bank's lending operations.

150.    As a direct and proximate cause of the breach of the fiduciary duty of care by the Director and Officer Defendants, the Bank suffered damages in excess of $115 million.

## COUNT III
## NEGLIGENCE CLAIMS AGAINST DIRECTOR AND OFFICER DEFENDANTS FOR APPROVING LOSS LOANS

151.    FDIC-R realleges and incorporates by reference the allegations contained in paragraphs 1 through 138.

152. The allegations of negligence in this Count III are pleaded in the alternative to the allegations of breach of fiduciary duty in Count II.

153. The Director Defendants were members of the DLC and Mutual Bank's Board of Directors. The Officer Defendants were members of the SOLC and were officers of Mutual Bank.

154. The Director and Officer Defendants owed Mutual Bank a duty to use reasonable care, skill and diligence in the performance of their duties, including, but not limited to: (a) conducting proper due diligence on proposed loans and the risks such loans posed to the Bank before approving them; (b) complying with the Bank's loan policies; (c) ensuring that any loans they approved were underwritten in a safe and sound manner; (d) ensuring that any loans they approved were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank; (e) ensuring that any loans they approved did not violate applicable banking laws and regulations; and (f) ensuring that any loans they approved did not create unsafe and unsound concentrations of credit.

155. The Director and Officer Defendants breached their duties and were negligent by, among other things: (a) failing to conduct proper due diligence on the Loss Loans and the risks the Loss Loans posed to the Bank before approving them; (b) approving the Loss Loans on terms that violated the Bank's loan policies; (c) failing to ensure that the Loss Loans were underwritten in a safe and sound manner; (d) failing to ensure that the Loss Loans were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank; (e) failing to ensure that the Loss Loans did not violate applicable banking laws and regulations; (f) failing to ensure that the Loss Loans did not create unsafe and unsound concentrations of credit; and (g) ignoring regulatory warnings about the Bank's lending operations.

36

156.   As a direct and proximate cause of the negligence of the Director and Officer Defendants, the Bank suffered damages in excess of $115 million.

## COUNT IV
## BREACH OF FIDUCIARY DUTY CLAIMS AGAINST
## DIRECTOR DEFENDANTS FOR APPROVING UNLAWFUL DIVIDENDS

157.   FDIC-R realleges and incorporates by reference the allegations contained in paragraphs 1 through 138.

158.   The Director Defendants were members of Mutual Bank's Board of Directors. As such these Defendants owed Mutual Bank a fiduciary duty to exercise the utmost care, skill and diligence in the supervision and management of the distribution of dividend payments to the Bank's shareholders.   They also owed the Bank a fiduciary duty of loyalty to not favor third parties at the expense of the Bank.

159.   The Director Defendants breached these fiduciary duties by: (a) approving dividend payments in 2007 and 2008 without conducting any inquiry into whether the dividends were proper given the Bank's deteriorating financial condition; (b) approving dividend payments in 2007 and 2008 that violated Illinois law without conducting any inquiry or investigation into whether the dividends were lawful; and (c) approving dividend payments that placed the interests of Directors Mahajan, Pethinaidu, Parameswari, Arun and Anu Veluchamy and other shareholders of Bancorp ahead of the Bank's interest.

160.   As a direct and proximate cause of the breach of these fiduciary duties by the Director Defendants, the Bank suffered damages in excess of $10.5 million plus accrued interest.

1916864-3

## COUNT V
## BREACH OF THE DUTY OF LOYALTY CLAIMS
## AGAINST THE VELUCHAMY DEFENDANTS AND MAHAJAN

161.    FDIC-R realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 138.

162.    As members of the Board of Directors, Arun and Anu Veluchamy ("Veluchamy Defendants") and Amrish Mahajan owed the Bank a duty of loyalty to protect the Bank's interest and avoid furthering their personal interests at the expense of the Bank. Directors and officers are not permitted to use their positions to profit personally at the Bank's expense.

163.    Defendants Anu and Arun Veluchamy and Defendant Mahajan breached that duty by causing the Bank to provide $10.5 million in dividend payments in 2007 and 2008 when the Bank was in severe distress and needed to conserve capital.

164.    Defendants Anu and Arun Veluchamy and Defendant Mahajan also breached their duty of loyalty by causing the Bank to pay dividends to them in violation of the provisions of Illinois law that restricts the payment of dividends to institutions in a state of good financial health, 205 ILCS 5/14.8(b). Subjecting the Bank to the consequences of such unlawful payments was grossly improper.

165.    As a direct and proximate cause of these Defendants' breach of the duty of loyalty, the Bank suffered damages in excess of $10.5 million plus accrued interest.

## COUNT VI
## BREACH OF FIDUCIARY DUTY CLAIMS AGAINST
## DIRECTOR DEFENDANTS FOR WASTE OF CORPORATE ASSETS

166.    FDIC-R realleges and incorporates by reference the allegations contained in paragraphs 1 through 138.

167.    The Director Defendants were members of Mutual Bank's Board of Directors.

38

168.    The Director Defendants owed Mutual Bank a fiduciary duty to exercise the utmost care, skill and diligence in the supervision and management of the use of Bank funds, including the duty to prohibit the waste of corporate assets.

169.    The Director Defendants owed Mutual Bank a fiduciary duty of loyalty, including the duty to put the Bank's interests ahead of the Director Defendants' personal interests or the interests of any third party.

170.    The Director Defendants breached their fiduciary duties by allowing and approving the wasteful use of Mutual Bank funds, including but not limited to: (a) approving and allowing the use of Bank funds to pay the costs associated with the defense of a criminal case against Mahajan's wife; (b) allowing the use of Bank funds to pay for the expense of holding a Board of Directors meeting in Monte Carlo when there was no legitimate business purpose for doing so; (c) approving and allowing the use of Bank funds to pay for costs associated with Arun Veluchamy's wedding; and (d) approving and allowing the use of Bank funds to pay contractors controlled by friends and relatives of Regas and Mahajan at costs that exceeded the value of the work performed.

171.    As a direct and proximate cause of the breach of the fiduciary duties by the Director Defendants, the Bank suffered damages in excess of $1.09 million.

### COUNT VII
### GROSS NEGLIGENCE CLAIMS AGAINST
### THE DIRECTOR DEFENDANTS FOR FAILURE TO SUPERVISE

172.    The FDIC alleges and incorporates by reference the allegations contained in paragraphs 1 through 138.

173.    Despite numerous warnings and danger signals, the Director Defendants were grossly negligent in failing to supervise and properly oversee the Bank's lending operations by,

1916864-3

among other things: (a) failing to hire and train adequate staff; (b) permitting the Bank to pursue an overly aggressive and risky loan growth strategy; (c) failing to correct poor underwriting practices; (d) failing to enforce the Bank's loan policies; (e) failing to control the overconcentration of CRE and ADC loans; (f) permitting loans to be made to favored borrowers on preferential and abusive terms even after such practices had been sharply criticized by federal regulators; (g) failing to exercise independent judgment in evaluating the actions of management although urged by regulators to do so; (h) ignoring regulatory warnings about the Bank's lending operations; (i) failing to control and limit transactions in which individual Director Defendants had a conflict of interest; and (j) failing to correct poor credit administration practices. Repeatedly, the Director Defendants failed to familiarize themselves with the conditions of the Bank, failed to ensure that proper records were kept of the Bank's operations and failed to investigate or appreciate the impact of the declining real estate market on the Bank's operations.

174.    Repeatedly both federal and state regulators urged Director Defendants to take a stronger hand in supervising the Bank's operations. The Director Defendants ignored this regulatory advice.

175.    These supervisory failures permitted poor underwriting, poor credit administration and corporate waste to flourish at Mutual Bank.

176.    As a result of the Director Defendants' grossly negligent failure to supervise, the Bank sustained damages in the amount of approximately $115 million plus accrued interest.

## COUNT VIII
## NEGLIGENCE AND BREACH OF FIDUCIARY DUTY CLAIMS
## AGAINST THE DIRECTOR DEFENDANTS FOR FAILURE TO SUPERVISE

177.    The FDIC realleges and incorporates by reference the allegations contained in paragraphs 1 through 138. The negligence and breach of fiduciary duty claims set forth below

are pleaded in the alternative.

178. Despite numerous warnings and danger signals, the Director Defendants negligently failed to supervise and oversee the Bank's operations by, among other things: (a) failing to hire and train adequate staff; (b) permitting the Bank to pursue an overly aggressive and risky loan growth strategy; (c) failing to correct poor underwriting practices; (d) failing to enforce the Bank's loan policies; (e) permitting overconcentration of CRE and ADC loans; (f) permitting loans to be made to favored borrowers on preferential and abusive terms; (g) failing to exercise independent judgment in evaluating the actions of management; (h) ignoring regulatory warnings about the Bank's lending operations; (i) permitting transactions to go forward in which certain Director Defendants had a conflict of interest; and (k) failing to correct poor credit administration practices. Repeatedly, the Director Defendants failed to familiarize themselves with the conditions of the Bank, failed to ensure that proper records were kept of the Bank's operations and failed to investigate or appreciate the impact of the declining real estate market on the Bank's operations.

179. Repeatedly both federal and state regulators urged Director Defendants to take a stronger hand in supervising the Bank's operations. The Director Defendants ignored this regulatory advice.

180. These supervisory failures permitted poor underwriting, poor credit administration and corporate waste to flourish at Mutual Bank. These failures were negligent or, in the alternative, a breach of the Defendants' fiduciary duty to the Bank.

181. As a result of the Bank's failure to supervise, the Bank sustained damages of $115 million plus accrued interest.

1916864-3

## COUNT IX
## LEGAL MALPRACTICE CLAIMS AGAINST
## ATTORNEY DEFENDANTS

182.    FDIC-R realleges and incorporates by reference the allegations contained in paragraphs 1 through 138.

183.    The Attorney Defendants were counsel to Mutual Bank from 2005 to July 31, 2009. During that period of time they were paid in excess of $3.0 million in fees for their representation of the Bank.

184.    As attorneys for the Bank, the Attorney Defendants owed Mutual Bank, their client, a duty to exercise a reasonable degree of care and skill in their representation of the Bank.

185.    With respect to the R&B Land Grantline, Shubh Hotels Boca, Muer Management and Shubh Hotels Detroit loans, the Attorney Defendants breached their duty to exercise reasonable care and skill in their representation of Mutual Bank in the following manner: (a) failing to advise the Bank of the risks associated with the grossly imprudent loan transactions which the Attorney Defendants actively facilitated as counsel; (b) failing to ensure that adequate due diligence was performed for the suspect loan transactions in which the Attorney Defendants served as counsel; (c) failing to protect the Bank from the lending misconduct of its officers and directors although fully aware of such misconduct and the damage it would inflict; and (d) placing the interests of Regas and third parties ahead of the interests of Mutual Bank by approving grossly imprudent transactions with entities in which Regas held an undisclosed interest.

186.    As a direct and proximate cause of the Attorney Defendants' breach of the duty of reasonable care and skill, the Bank suffered damages in excess of $68.5 million.

1916864-3

187.    Additionally, the fees paid to the Attorney Defendants for periods in which they were in breach of their fiduciary duty should be disgorged.

**COUNT X**
**BREACH OF FIDUCIARY DUTY CLAIMS**
**AGAINST ATTORNEY DEFENDANTS**

188.    FDIC-R realleges and incorporates by reference the allegations contained in paragraphs 1 through 138.

189.    The Attorney Defendants were counsel to Mutual Bank from 2005 to July 31, 2009.  During that period of time, Defendant Regas and his firm were paid in excess of $3.0 million in fees for their representation of the Bank.

190.    The Attorney Defendants owed Mutual Bank, their client, a fiduciary duty of due care and loyalty, including the duty to put the Bank's interests ahead of the Director Defendants' personal interests or the interests of any third party.

191.    The Attorney Defendants breached their duty to exercise reasonable care and skill in their representation of Mutual Bank by failing to advise the Bank's Board of Directors that payment of dividends was unlawful and failing to protect the Bank from such payments.  The Attorney Defendants also breached their fiduciary duties with respect to the R&B Land Grantline, Shubh Hotels Boca, Muer Management and Shubh Hotels Detroit loans in the following manner: (a) failing to advise the Bank of the risks associated with the grossly imprudent loan transactions which the Attorney Defendants actively facilitated as counsel; (b) failing to ensure that adequate due diligence was performed for the suspect loan transactions in which the Attorney Defendants served as counsel; (c) failing to protect the Bank from the lending misconduct of its officers and directors although fully aware of such misconduct and the damage it would inflict; and (d) placing the interests of Regas and third parties ahead of the

43

interests of Mutual Bank by approving grossly imprudent transactions with entities in which Regas held an undisclosed interest.

192.     As a direct and proximate cause of the Attorney Defendants' breach of the fiduciary duty of care and loyalty, the Bank has suffered damages in excess of $79 million.

193.     Additionally, the fees paid to the Attorney Defendants during the periods in which they were in breach of their fiduciary duty should be disgorged.

**COUNT XI**
**AIDING AND ABETTING BREACH OF FIDUCIARY**
**DUTY CLAIMS AGAINST ATTORNEY DEFENDANTS**

194.     FDIC-R realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 and 146 through 150 and 158 through 165.

195.     With respect to the R&B Land Grantline, Shubh Hotels Boca, Muer Management and Shubh Hotels Detroit Loss Loans, the Attorney Defendants aided and abetted the Director and Officer Defendants' breach of their fiduciary duties by: (a) providing material assistance in the making of those four Loss Loans that the Attorney Defendants knew to be a breach of the Officer and Director Defendants' duties; (b) ignoring warnings from regulators regarding the Bank's underwriting and credit administration practices and failing to advise the Bank of the consequences of these warnings; and (c) approving and facilitating lending conduct that violated federal regulations and the Bank's loan policies.   The Attorney Defendants also aided and abetted the Director and Officer Defendants' breach of their fiduciary duties by actively facilitating dividend payments in 2007 and 2008 in violation of Illinois law.

196.     The Attorney Defendants were aware or should have been aware that their actions were aiding the Director and Officer Defendants' breaches of fiduciary duties.   The Attorney

44

Defendants assisted the Director and Officer Defendants' breaches of fiduciary duty with knowledge that their actions were assisting the D&O Defendants' wrongful conduct.

197.     As a direct and proximate cause of the Attorney Defendants' aiding and abetting the D&O Defendants' breaches of fiduciary duties, the FDIC-R has suffered damages in excess of $79 million.

## VI.     PRAYER FOR RELIEF

WHEREFORE, FDIC-R asks this Court to grant the following relief:

A.     As to Counts I-III, entry of judgment in favor of FDIC-R for damages in an amount in excess of $115 million plus accrued interest;

B.     As to Count IV and V, entry of judgment in favor of FDIC-R for damages in the amount of $10.5 million plus accrued interest;

C.     As to Count VI, entry of judgment in favor of FDIC-R for damages in excess of $1.09 million plus accrued interest;

D.     As to Count VII, entry of judgment in favor of FDIC-R for damages in excess of $115 million plus accrued interest;

E.     As to Count VIII, entry of judgment in favor of FDIC-R for damages in excess of $115 million plus accrued interest;

F.     As to Count IX, entry of judgment in favor of FDIC-R for damages in an amount in excess of $68.5 mill ion, plus disgorgement of any payments made to the Attorney Defendants during the period in which they breached their fiduciary duties, plus accrued interest;

G.     As to Count X, entry of judgment in favor of FDIC-R for damages in an amount in excess of $79 million, plus disgorgement of any payments made to the Attorney Defendants during the period in which they breached their fiduciary duties, plus accrued interest;

H.     As to Count XI, entry of judgment in favor of FDIC-R for damages in an amount in excess of $79 million plus disgorgement of any payments made to the Attorney Defendants during the period in which they aided and abetted, plus accrued interest; and

I.     For such further and other relief as this Court deems proper.

1916864-3

## JURY DEMAND

THE FDIC-R REQUESTS A TRIAL BY JURY ON ALL ISSUES TRIABLE OF RIGHT BY JURY

Dated:  October 25, 2011

Respectfully submitted,

One of the Attorneys for the Federal Deposit
Insurance Corporation as Receiver for Mutual
Bank

F. Thomas Hecht
Tina B. Solis
Dean J. Polales
Richard H. Tilghman
UNGARETTI & HARRIS LLP
3500 Three First National Plaza
Chicago, Illinois 60602
(312) 977-4400
(312) 977-4405 (facsimile)


Robert J. DeHenzel, Jr.
Counsel, Professional Liability Unit
Federal Deposit Insurance Corporation
3501 Fairfax Drive
Arlington, VA 22226
(703) 562-2361

46

1916864-3