IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for Mutual
Bank,

      Plaintiff,

v.

AMRISH MAHAJAN, ET. AL,

      Defendants.

No. 11-cv-7590

JURY TRIAL DEMANDED

Judge Virginia Kendall

## DEFENDANTS ARUN AND ANU VELUCHAMY'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS/STRIKE FDIC'S COMPLAINT

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................... 1

II.     FACTUAL BACKGROUND AND COMPLAINT ALLEGATIONS ............................ 1

III.    LEGAL STANDARD............................................................................................ 3

IV.     ARGUMENT ...................................................................................................... 3

       A.      The Business Judgment Rule Precludes the FDIC's Purported Claims ................ 4

       B.      Common Law Claims For Gross Negligence Do Not Exist Under Illinois Law ............................................................................................................... 6

       C.      The FDIC Improperly Attempts to Apply a Strict Liability Standard .................. 7

              1.      Growth of Mutual's Loan Portfolio ........................................................... 9

              2.      Failure to Follow Mutual's Loan Policy................................................... 10

              3.      Response to Regulatory Warnings............................................................ 11

              4.      Approval of Loss Loans............................................................................ 14

              5.      Use of Mutual's Capital for Personal Expenses ...................................... 16

              6.      Approval of Dividend Payments............................................................... 17

       D.      The FDIC Fails To Adequately Allege Gross Negligence Under FIRREA ........ 18

       E.      The FDIC's Duplicative Claims Should Be Dismissed...................................... 21

V.      IMMATERIAL ALLEGATIONS SHOULD BE STRICKEN ..................................... 23

VI.     CONCLUSION.................................................................................................. 24

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Albert v. Alex. Brown Mgmt. Servs., Inc.*,
  2005 WL 2130607 (Del. Ch. Aug. 26, 2005) ........................................................... 20

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S.Ct. 1937 (2009) ................................................................. 3, 16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................. 3

*Beringer v. Standard Parking O'Hare Joint Venture*,
  Nos. 07 C 5027, 07 C 5119, 2008 WL 4890501 (N.D. Ill. Nov. 12, 2008) ............... 21

*Brehm v. Eisner*,
  746 A.2d 244 (Del. 2000) ....................................................................................... 16

*Cohen v. Ayers*,
  596 F.2d 733 (7th Cir. 1979) ................................................................................... 16

*DeGeer v. Gillis*,
  707 F. Supp. 2d 784 (N.D. Ill. 2010) ......................................................................... 7

*E.E.O.C. v. Concentra Health Servs., Inc.*,
  496 F.3d 773 (7th Cir. 2007) ..................................................................................... 3

*Edgewater Med. Ctr. v. Rogan et al.*,
  No. 04 C 3579, 2010 WL 2711448 (N.D. Ill. July 6, 2010) ...................................... 22

*ExxonMobil Oil Corp. v. AMEX Constr. Co.*,
  702 F. Supp. 2d 942 (N.D. Ill. 2010) ......................................................................... 6

*FDIC v. Bierman*,
  2 F.3d 1424 (7th Cir. 1993) ....................................................................................... 8

*FDIC v. Brown*,
  812 F. Supp. 722 (S.D. Tex. 1992) ............................................................................. 4

*FDIC v. Gravee*,
  966 F. Supp. 622 (N.D. Ill. 1997) ............................................................................. 18

*FDIC v. Greenwood*,
  739 F. Supp. 450 (C.D. Ill. 1989) ............................................................................. 23

*FDIC v. Saphir*,
  No. 10 C 7009, 2011 WL 3876918 (N.D. Ill. Sept. 1, 2011) ................................. 5, 21

*FDIC v. Schuchmann*,
  235 F.3d 1217 (10th Cir. 2000) ............................................................................... 15

*FDIC v. Spangler*,
  No. 10-cv-4288, 2011 WL 6754022, at *10–11 (N.D. Ill. Dec. 22, 2011) .......... 5, 18, 21

*FDIC v. Stahl*,
  854 F. Supp. 1565 (S.D. Fla. 1994) ........................................................................... 5

*FDIC v. Stanley*,
  770 F. Supp. 1281 (N.D. Ind. 1991) ..................................................................... 7, 15

*Ferris Elevator Co. v. Neffco, Inc.*,
  285 Ill. App. 3d 350 (3d Dist. 1996) ......................................................................... 4

*First Nat'l Bank of Bellaire v. Comptroller of Currency*,
  697 F.2d 674 (5th Cir. 1983) ..................................................................................... 9

## TABLE OF AUTHORITIES
(continued)

**Page**

First Nat'l Bank of Lincolnwood v. Keller,
  318 F. Supp. 339 (N.D. Ill. 1970) ................................................... 10, 11

Gen. Elec. Cap. Corp. v. Lease Resolution Corp.,
  128 F.3d 1074 (7th Cir. 1997) ........................................................ 12, 17

Holzer v. Prudential Equity Group LLC,
  520 F. Supp. 2d 922 (N.D. Ill. 2007) ................................................... 23

IMR USA, Inc. v. GES Exposition Servs., Inc.,
  No. 04 C 100, 2005 WL 736589 (N.D. Ill. Mar. 31, 2005) .......................... 19

In re Berg, 387 B.R. 524, 567 (Bankr. N.D. Ill. 2008) ................................... 19

In re Walt Disney Co. Derivative Litig.,
  906 A.2d 27 (Del. 2006) .................................................................... 16

Irshad Learning Ctr. v. County of DuPage, et al.,
  No. 10 C 2168, 2011 WL 1225459 (N.D. Ill. Mar. 28, 2011) ........................ 23

Lavery v. Kearns,
  792 F. Supp. 847 (D. Me. 1992) .......................................................... 15

Limestone Dev. Corp. v. Village of Lemont, Ill.,
  520 F.3d 797 (7th Cir. 2008) ............................................................... 3

Merit Ins. Co. v. Colao,
  603 F.2d 654 (7th Cir. 1979) ............................................................... 6

Miller v. Thomas,
  275 Ill. App. 3d 779 (1st Dist. 1995) ...................................................... 5

Murphy v. Capital One Bank,
  No. 08 C 801, 2008 WL 3876138 (N.D. Ill. Aug. 18, 2008) ......................... 23

Nat'l Am. Ins. Co. v. Indiana Lumbermens Mut. Ins. Co.,
  No. 97 C 5431, 1999 WL 35339 (N.D. Ill. Jan. 13, 1999) ........................... 23

Oakland County Empl. Ret. Sys. v. Massaro,
  736 F. Supp. 2d 1181 (N.D. Ill. 2010) .................................................. 16

People v. Bauman,
  34 Ill. App. 3d 582 (1st Dist. 1975) ...................................................... 20

People v. Khan,
  136 Ill. App. 3d 754 (1st Dist. 1985) .................................................... 19

Peregrine Emerging CTA Fund, LLC v. Tradersource, Inc.,
  No. 07 C 5528, 2008 WL 474369 (N.D. Ill. Feb. 19, 2008) ......................... 20

Powell v. W. Ill. Elec. Coop.,
  180 Ill. App. 3d 581 (4th Dist. 1989) ...................................................... 4

Qualls v. Cunningham,
  No. 05-4078, 2006 WL 1476143 (7th Cir. May 26, 2006) ............................. 6

R.T.C. v. Franz,
  909 F. Supp. 1128 (N.D. Ill. 1995) ......................................... 6, 18, 19, 20

Reid v. Norfolk & W. Ry. Co.,
  157 F.3d 1106 (7th Cir. 1998) .............................................................. 7

RTC v. O'Connell,
  No. 94 C 4186, 1996 WL 153866 (N.D. Ill. Mar. 29, 1996) ......................... 19

Rush Univ. Med. Ctr. v. Minnesota Mining & Mfg. Co.,
  No. 04 C 6878, 2007 WL 4198233 (N.D. Ill. Nov. 21, 2007) ....................... 19

## TABLE OF AUTHORITIES
(continued)

| | Page |
|---|---|

*Seidman v. OTS*,
    37 F.3d 911 (3d Cir. 1994) .................................................................... 15

*Shaper v. Bryan*,
    371 Ill. App. 3d 1079 (1st Dist. 2007) ........................................ 4, 15, 20

*Stamp v. Touche Ross & Co.*,
    263 Ill. App. 3d 1010 (1st Dist. 1993) ................................................ 5, 6

*Starrels v. First National Bank*,
    870 F.2d 1168 (7th Cir. 1989) ............................................................... 4

*Treco, Inc. v. Land of Lincoln Sav. & Loan*,
    749 F.2d 374 (7th Cir. 1984) ................................................................. 4

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
    987 F.2d 429 (7th Cir. 1993) ............................................................... 11

*Wallach v. Billings*,
    277 Ill. 218 (1917) ......................................................................... 7, 15

*Ziarko v. Soo Line R.R.*,
    161 Ill. 2d 267 (1994) ........................................................................ 20

**Statutes**

12 U.S.C. § 1821(k) ................................................................................ 18
12 U.S.C. § 1831o(d)(1) ........................................................................ 17
12 U.S.C. § 1831p-1 ............................................................................. 15
205 ILCS § 5/16 ................................................................................... 20
205 ILCS 5/14(8)(a) ....................................................................... 17, 18

**Other Authorities**

William Prosser, The Law of Torts § 34 (4th ed. 1971) ............................ 19

**Rules**

12 C.F.R. § 325.103(b)(2), (3) ............................................................... 17
12 C.F.R. § 365, App. A……………………………………………………15
Fed. R. Civ. P. 12(f) ............................................................................. 23
Fed. R. Evid. 201 ........................................................................... 12, 17

As and for their Memorandum of Law in support of their Motion to Dismiss/Strike the Complaint ("Complaint" or "Compl.") of Plaintiff Federal Deposit Insurance Corporation (the "FDIC"), Defendants Arun and Anu Veluchamy (collectively, the "Veluchamys") state:[1]

## I.      INTRODUCTION

Through its Complaint, the FDIC seeks to recover over $126 million for losses suffered by Mutual Bank ("Mutual" or the "Bank") on twelve "CRE" (commercial real estate) and "ADC" (acquisition, development and construction) loans, allegedly unlawful dividend payments, and expenditures alleged to constitute a waste of corporate assets.  The FDIC purports to asserts causes of action against the Veluchamys—former directors of Mutual—for, *inter alia*, gross negligence, negligence, breach of fiduciary duty, and corporate waste.

However, the FDIC's Complaint is legally deficient and must be dismissed for the following reasons:  (A) the FDIC's purported claims are barred by the business judgment rule; (B) Illinois does not recognize common law claims for gross negligence; (C) the FDIC improperly attempts to apply a strict liability standard; (D) the FDIC fails to state a claim for statutory gross negligence under FIRREA; (E) the FDIC asserts duplicative causes of action; and (F) the FDIC's Complaint contains numerous immaterial and impertinent allegations which do not give rise to a cognizable claim.  For these reasons, the Veluchamys respectfully request that the Court grant their Motion to Dismiss/Strike, and dismiss the Complaint against them with prejudice.

## II.      FACTUAL BACKGROUND AND COMPLAINT ALLEGATIONS

Mutual was chartered in 1962 under the law of Illinois and was wholly owned by First Mutual Bancorp of Illinois, Inc.  (Compl. ¶ 10.)  Mutual was a nonmember bank and was insured

---

[1] The Veluchamys incorporate by reference all arguments made by co-defendants Amrish Mahajan, Steven Lakner, Ronald Tucek, Patrick McCarthy, Paul Pappageorge, Richard Barth, Thomas Pacocha, James Regas, and Regas, Frezados & Dallas LLP in their respective motions to dismiss.

by the FDIC. (*Id.*) In addition to ten (10) Chicagoland locations—including its main branch in Harvey, Illinois—Mutual had branches in New Jersey, New York, and Texas. (*Id.*)

Both Arun Veluchamy and Anu Veluchamy served on Mutual's Board of Directors. (*Id.* ¶¶ 15–16.) Arun served as a director from 2001 through the bank's closing in July 2009. (*Id.* ¶ 15.) Anu served as a director from 2004 through the bank's closing in July 2009. (*Id.* ¶ 16.) During their period of service as directors, the Veluchamys also served on Mutual's Directors' Loan Committee ("DLC"). (*Id.* ¶¶ 15–16.) Mutual had established extensive policies governing lending, including procedures for loan approval based on the amount of the loan. (*Id.* ¶¶ 35–36.) As members of the DLC, the Veluchamys could participate in Mutual's decision to grant or deny loans in excess of $1 million. (*Id.* ¶ 36.)

Unfortunately, some of Mutual's borrowers did not repay their loans as agreed. (*Id.* ¶ 57.) On July 31, 2009, Mutual was closed by the Illinois Department of Financial and Professional Regulations ("IDFPR"), becoming the 94th bank since 2008 to fall victim to the Great Recession. (*Id.* ¶ 8.) The FDIC was subsequently appointed receiver.

In light of the FDIC's apparent strategy of alleging breaches of duties that do not exist, this Motion will benefit from a concise statement of the allegations faced by the Veluchamys. The FDIC alleges eight causes of action involving the Veluchamys: Gross Negligence for Approving Loss Loans (Count I); Breach of the Fiduciary Duty of Care for Approving Loss Loans (Count II); Negligence for Approving Loss Loans (Count III—pled in alternative to Count II); Breach of Fiduciary Duty for Approving Unlawful Dividends (Count IV); Breach of Duty of Loyalty (Count V); Breach of Fiduciary Duty for Waste of Corporate Assets (Count VI); Gross Negligence for Failure to Supervise (Count VII); and Negligence and Breach of Fiduciary Duty for Failure to Supervise (Count VIII). (*Id.* ¶¶ 139–181.)

In support of its claims that the Veluchamys breached the various alleged duties that they owed to Mutual, the FDIC alleges several events (the "Alleged Breaches"): (1) growth of Mutual's loan portfolio; (2) failure to follow Mutual's loan policy; (3) inadequate response to regulatory warnings; (4) approval of 12 loans on which Mutual lost money; (5) use of Mutual's capital for personal expenses; and (6) approval of dividend payments. (*Id*. ¶¶ 28–119.) As explained below, each of the causes of action against the Veluchamys fails.

### III. LEGAL STANDARD

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of a complaint. FED. R. CIV. P. 12(b)(6). Courts "are not bound to accept as true legal conclusions couched as factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Indeed, a plaintiff's obligation to provide the grounds of entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Allegations "must be sufficient to raise the possibility of relief above the 'speculative level.'" *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). Only a complaint "that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 129 S.Ct. at 1949–50. This is because "a defendant should not be forced to undergo costly discovery unless the complaint contains enough detail . . . to indicate that the plaintiff has a substantial case." *Limestone Dev. Corp. v. Village of Lemont, Ill.*, 520 F.3d 797, 802–03 (7th Cir. 2008).

### IV. ARGUMENT

In its Complaint, the FDIC relies principally on salacious allegations in an attempt to state a claim against the Veluchamys. When closely examined, it is evident that the FDIC has failed to state a claim upon which relief can be granted.

A.        **The Business Judgment Rule Precludes the FDIC's Purported Claims**

The FDIC's claims for negligence and breach of fiduciary duty (Counts II, III, IV, V, VI, and VIII) must be dismissed for failure to plead around the business judgment rule (the "BJR"). The BJR creates a "presumption that directors of a corporation make business decisions on an informed basis, in good faith, and with the honest belief that the course taken was in the best interests of the corporation." *Ferris Elevator Co. v. Neffco, Inc.*, 285 Ill. App. 3d 350, 354 (3d Dist. 1996); *see also, e.g.*, *Powell v. W. Ill. Elec. Coop.*, 180 Ill. App. 3d 581, 585 (4th Dist. 1989) (same). Further, the BJR provides that directors "will not be held liable for honest errors or mistakes of judgment." *Treco, Inc. v. Land of Lincoln Sav. & Loan*, 749 F.2d 374, 377 (7th Cir. 1984). Consequently, directors are not held strictly liable for mere failure to be familiar with all aspects of their business decisions. *See, e.g.*, *Shaper v. Bryan*, 371 Ill. App. 3d 1079, 1090 (1st Dist. 2007) ("the duty of the Board to inform itself before making business decisions does not require that the Board be intimately familiar with every proposal and fact"). The BJR is especially important in the inherently risky world of banking:

> [W]ith the benefit of hindsight, the FDIC . . . could almost always allege one or more acts of negligence by bank directors in approving a bad loan. Had the directors obtained better or more current appraisals, more or better security for the loan, and had the bank better monitored the payment history of the loan and subsequent changes in the credit-worthiness of the borrower, almost any loan could have been made more secure, or at least the bank could have suffered a smaller loss on it. The business judgment rule protects bank directors from being guarantors on loans made by banks . . . . The rule also encourages directors to exercise their judgment in making loans and not to foreclose credit markets to all but blue-chip borrowers.

*FDIC v. Brown*, 812 F. Supp. 722, 723 (S.D. Tex. 1992); *see also Starrels v. First National Bank,* 870 F.2d 1168, 1171 (7th Cir. 1989) (complaint did not survive business judgment rule because the "allegations merely show[ed] with hindsight that these loans were a mistake"); *FDIC*

*v. Stahl,* 854 F. Supp. 1565, 1568-69 (S.D. Fla. 1994) (board decisions must be assessed at the time of the decision and not in "hindsight").

Under Illinois law, the BJR may properly be considered at the pleading stage of litigation.[2] *See, e.g.*, *Miller v. Thomas*, 275 Ill. App. 3d 779, 788 (1st Dist. 1995); *see also FDIC v. Spangler*, No. 10-cv-4288, 2011 WL 6754022, at *10–11 (N.D. Ill. Dec. 22, 2011).

Here, the BJR warrants dismissal of the FDIC's claims for negligence and breach of fiduciary duty—Counts II, III, IV, V, VI, and VIII. Illinois case law implies a two-pronged analysis under the BJR. *See Stamp v. Touche Ross & Co.*, 263 Ill. App. 3d 1010 (1st Dist. 1993). First, an inquiry must be made as to whether the allegations attack an exercise of business judgment by the defendant. Second, a court must determine whether the plaintiff has sufficiently pleaded around those presumptions, specifically by alleging "bad faith, fraud, illegality or gross overreaching." *Id.* at 1016.

Illinois courts take a liberal approach when determining what constitutes an exercise of business judgment. In *Stamp*, for example, the court found that the plaintiff's allegations of breach of fiduciary duty and negligent mismanagement fell within the ambit of the BJR, noting that the defendants were charged with "failure to develop 'adequate' underwriting procedures and controls, from which it may be reasonably inferred that they did develop some underwriting procedures and controls although, in plaintiff's opinion, they were inadequate." *Id.* at 1016–17. Here, similarly, the FDIC alleges inadequate lending procedures but admits that "an extensive loan policy" did exist. (Compl. ¶¶ 32, 35.)

The *Stamp* court further analyzed the plaintiff's complaint, noting that:

---

[2] Courts in the Northern District of Illinois have been inconsistent in their application of the BJR at the pleadings stage. *See FDIC v. Saphir*, No. 10 C 7009, 2011 WL 3876918, at *5 (N.D. Ill. Sept. 1, 2011) (does not apply); *FDIC v. Spangler*, No. 10-cv-4288, 2011 WL 6754022, at *10–11 (N.D. Ill. Dec. 22, 2011) (does apply). The Veluchamys respectfully submit that *Spangler* represents the better reasoned view.

> The allegations which come the closest to establishing plaintiff's cause of action are [those that] charge defendants with failing to oversee the performance of managing general agents, wrongful delegations of responsibility, and failure to properly manage and supervise. . . . *[T]hese allegations, as currently framed, attack no more than the defendants' actual exercise of their business judgment and are consequently within the parameters of the business judgment rule.*

263 Ill. App. 3d at 1017 (emphasis added). Such allegations were "exactly the type of second-guessing which the business judgment rule was designed to preclude." *Id.* This is precisely what the FDIC is doing in this case.

The Complaint is also devoid of non-conclusory allegations of bad faith, fraud, illegality or gross overreaching. Accordingly, Counts II, III, IV, VI, and VIII must be dismissed.

### B. Common Law Claims For Gross Negligence Do Not Exist Under Illinois Law

Count VII must be dismissed because it asserts a nonexistent cause of action. It is well settled that "Illinois law does not recognize gross negligence as a separate cause of action." *ExxonMobil Oil Corp. v. AMEX Constr. Co.*, 702 F. Supp. 2d 942, 974 n.9 (N.D. Ill. 2010); *see also Qualls v. Cunningham*, No. 05-4078, 2006 WL 1476143, at *1 (7th Cir. May 26, 2006) (no independent cause of action for gross negligence in Illinois); *Merit Ins. Co. v. Colao*, 603 F.2d 654, 659 (7th Cir. 1979) (affirming dismissal of gross negligence claim because "Illinois does not recognize gross negligence as an independent ground for recovery").

While Count I also alleges gross negligence, it does so on a statutory basis—FIRREA. *See, e.g.*, *R.T.C. v. Franz*, 909 F. Supp. 1128, 1139 (N.D. Ill. 1995) (noting that FIRREA creates a cause of action for gross negligence even though no such action exists under Illinois law). Count VII, however, neither pleads FIRREA as a basis nor incorporates the allegations of Count I (in which the FDIC does plead FIRREA as a basis). Consequently, because Illinois does not recognize a state law cause of action for gross negligence, Count VII must be dismissed.

CHICAGO/#2275830.3

### C.     The FDIC Improperly Attempts to Apply a Strict Liability Standard

Counts I through VIII must be dismissed because the FDIC fails to plead the requisite elements of its causes of action for gross negligence, negligence, and breach of fiduciary duty. The FDIC also improperly attempts to hold the Veluchamys strictly liable for Mutual's losses.

For each cause of action, the facts in the Complaint must support the FDIC's allegations that the Veluchamys breached duties owed to Mutual.  To state a cause of action for breach of fiduciary duty, the FDIC must allege (1) a fiduciary duty on the part of the defendant, (2) a breach of that duty, (3) an injury, and (4) a proximate cause between the breach and the injury. *See DeGeer v. Gillis*,  707 F. Supp. 2d 784, 795 (N.D. Ill. 2010).  Similarly, for its negligence-based claims, the FDIC must allege:  (1) the existence of a duty of care owed by the defendant to the plaintiff, (2) a breach of that duty, and (3) an injury proximately caused by that breach. *Reid v. Norfolk & W. Ry. Co.*, 157 F.3d 1106 (7th Cir. 1998).

In an attempt to avoid its pleading obligations, the FDIC seeks to hold the Veluchamys to the heightened standard of "utmost care, skill and diligence."  (Compl. ¶ 148.)  Indeed, the Complaint is full of allegations that the defendants were supposed to *"ensure"* certain results, e.g. that loans were properly underwritten, that collateral was sufficiently valuable, that loans did not violate laws, and that loans did not create unsafe and unsound concentrations of credit.  (*Id.* at ¶¶ 142, 143, 148, 149, 154, and 155.)  However, bank directors "are not liable for every loss which happens to occur," because "[s]uch a rule would make a bank director an insurer, which he is not." *Wallach v. Billings*, 277 Ill. 218, 233 (1917).  *See also FDIC v. Stanley*, 770 F. Supp. 1281, 1310 (N.D. Ind. 1991) ("directors are not insurers or guarantors of the fidelity and proper conduct of the executive officers of the bank, and they are not responsible for losses resulting from their wrongful acts or omissions, provided they have exercised ordinary care in the discharge of their own duties as directors").  Alleging the failure "to ensure" these certain results

is no different than designating the directors as insurers; "ensure" and "insure" are interchangeable. Even if a bank director breaches a duty, he or she "will not be liable for losses to the corporation absent a showing that his act or omission proximately caused the subsequent losses." *FDIC v. Bierman*, 2 F.3d 1424, 1434 (7th Cir. 1993). The FDIC should not be allowed to flaunt the law and allege that the directors breached their duties by "failing to ensure" the result the FDIC thinks appropriate. Directors are neither "ensurers" nor "insurers."

In a failed effort to state a claim where none exists, the FDIC alleges (in conclusory fashion) that the following conduct is actionable: (1) growth of Mutual's loan portfolio; (2) failure to follow Mutual's loan policy; (3) inadequate response to regulatory warnings; (4) approval of 12 loans on which Mutual lost money; (5) use of Mutual's capital for personal expenses; and (6) approval of dividend payments. (Compl. ¶¶ 28–119.) The FDIC even cites as a recurring "deficiency" the fact that the defendants "caused the loans to be made after the commercial real estate market began its decline and collateral values had plummeted." Here, the FDIC attempts to substitute its judgment for that of the directors as to whether Mutual would continue to lend money. The allegations in the Complaint, however, fail to support a claim that the Veluchamys breached any duties owed to Mutual—ordinary *or* heightened. By failing to adequately plead the elements of its causes of action, the FDIC is essentially seeking to hold the Veluchamys strictly liable for Mutual's losses. This tactic has already been firmly rejected by the Supreme Court of Illinois:

> [T]he case for the complainant seems to have been prepared and presented upon the theory that when a bank has failed and it appears that there was a general supineness and looseness of management by the directors the burden of exoneration for the losses is on the directors. This is not a correct theory.

*Id.* at 232.

### 1. Growth of Mutual's Loan Portfolio

The FDIC alleges that Mutual "rapidly grew its loan portfolio, primarily through CRE and ADC loans." (Compl. ¶ 28.) There is nothing *per se* actionable about increasing a bank's loan portfolio, and the FDIC attempts to paint this conduct as tortious by manufacturing a duty to follow peer institutions. (*Id.* ¶ 29.)

Even if it could show that failure to follow peer institutions was a duty owed by the Veluchamys, the FDIC cannot adequately allege proximate causation. In *First Nat'l Bank of Bellaire v. Comptroller of Currency*, for example, the Fifth Circuit Court of Appeals was presented with a regulator's argument based on a peer analysis and noted that "[w]ithout a connection between the peer group analysis and a finding of unsafe and unsound capital levels, therefore, the peer group analysis does not support the Comptroller's finding that the Bank's capital level was unsafe and unsound." 697 F.2d 674, 686 (5th Cir. 1983). Here, the FDIC does not plead any correlation between the peer group bank standard and bank stability. The FDIC does not allege that Mutual's peer banks were all stable, suffered no loan losses, and survived the "Great Recession"; rather, the FDIC merely points to a statistical difference between Mutual and "peer banks." This does not constitute a basis upon which to hold directors individually liable.

The FDIC next attacks Mutual's internal hiring and staffing decisions, and the fact that a "small number of high-volume borrowers" comprised part of Mutual's loan portfolio. (Compl. ¶¶ 30–31.) However, the FDIC fails to allege how this proximately caused losses to Mutual.

Additionally, The FDIC's conclusory allegation that Mutual had "improvident lending practices" is supposedly supported by the alleged absence of reports or the timing of receipt of documents. (*Id.* ¶ 32) But nowhere does the FDIC allege when the documents were purportedly missing; the FDIC took over the Bank and its records in July 2009 and there are no allegations that the records were missing at the time the Veluchamys made their decisions, voted on the

-9-

subject loans, or that the Veluchamys knew or should have known about any alleged document issues.[3] Nor does the timing of the receipt of appraisals or the nature of retention of the appraisers (*Id.* ¶ 32) indicate any deficiency in the appraisals themselves or suggest that the appraised values did not support the loans at the time they were made. Although the FDIC alleges that "the Bank's ability to calculate accurate loan loss reserves was called into question as early as 2005" (*Id.* ¶ 33), nowhere does the FDIC allege that any loan loss reserve was deficient; nor does the FDIC ever identify any loan that was under-reserved at any point in time.

### 2.     Failure to Follow Mutual's Loan Policy

The FDIC also looks to Mutual's internal lending policies and procedures as a source of actionable duties. The FDIC's reliance on these policies and procedures is unavailing. To begin with, the FDIC praises rather than criticizes Mutual's loan policies, noting that "Mutual maintained an extensive loan policy" and that Mutual's loan policy "required diligent underwriting in conformity with state and federal law, close monitoring of concentrations of credit, rigorous documents, and prudent evaluation of risk." (*Id.* ¶ 35.)

To the extent the FDIC attempts to reconcile this praise with its glaringly conclusory allegation that "Defendants routinely ignored the Bank's loan policy requirements and did not enforce policy provisions," such an argument is similarly unavailing. (*Id.* ¶ 37.) In *First Nat'l Bank of Lincolnwood v. Keller*, a national banking association sued a former director, attempting to impose personal liability for what the Office of the Comptroller of the Currency determined to be "loss loans." 318 F. Supp. 339 (N.D. Ill. 1970). In assessing the bank's heavy reliance "on the fact that [director defendant] failed to follow Bank regulations in certain of his dealings," the court noted that "violation of a bank's internal rules and regulations with regard to lending

---

[3] Nor is there an allegation that the Veluchamys were responsible for maintaining any of the unidentified missing records.

procedure does not, without more, make a director and officer liable for the default of such loans," and that common law "*does not make [a director] an insurer of the success of all ventures merely because corporate procedures are ignored.*" *Id.* (emphasis added).

### 3.    Response to Regulatory Warnings

The FDIC also attempts to allege that Mutual's failure resulted from the failure to correct deficiencies identified and described by regulators in certain Reports of Examination ("ROEs"). (Compl. ¶¶ 38–56.)  This Court can consider the ROEs because the documents are referred to in the FDIC's complaint and are central to the FDIC's allegations.  *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).[4]  A review of Mutual's ROEs, and the ratings assigned by the regulators, shows that these allegations are without basis.

Based on the alleged approval dates of the specific loans mentioned in the Complaint, the only regulatory warnings that can form the basis for any claim by the FDIC relating to the loans identified in the Complaint are the full scope risk management examinations in 2004, 2005, 2006, and 2007.  This is because each of the twelve "loss loans" indentified by the FDIC were made prior to the date of the 2008 examination.  The FDIC's failure to identify with specificity the "regulatory warnings" that the Veluchamys are alleged to have "ignored" is significant.

Between December 2004 and June 2008, the regulators provided constant ongoing supervision of Mutual.  According to the Material Loss Review of Mutual ("MLR") prepared by the Office of Inspector General, over this 3-1/2 year time frame, the regulators conducted five onsite full scope risk management examinations, four onsite visitations and nine offsite reviews

---

[4] The 2006 and 2007 ROEs have been filed with the Court under seal pursuant to the Court's Order dated January 13, 2012, as Exhibits 1 and 2 to the Memorandum of Law in Support of the Motion to Dismiss of Steven Lakner, Ronald Tucek, Patrick McCarthy, and Paul Pappageorge, filed on January 18, 2012.

of Mutual.[5]  (MLR at 12-14.)  In other words, the regulators reviewed the condition of the Bank approximately five times each year.  (*Id.*)  At the conclusion of each full scope risk examination of the Bank, the regulators assigned two types of ratings to the Bank:  an overall composite rating and CAMELS component ratings.  Following every single full-scope examination during the years 2004 through 2007 (which is all the examinations conducted prior to the last loan identified in the Complaint being approved), the regulators assigned Mutual an overall composite rating of 2, the second highest composite rating.  The regulators similarly assigned a rating of 2 to the management of Mutual (as well as almost all other component areas throughout these years: capital, assets, earnings, liquidity and sensitivity to market risk) for the same period:

| Examination Start Date | Agency | Supervisory Ratings (UFIRS) | Supervisory Action |
|---|---|---|---|
| May 7, 2004 | FDIC | 222222/2 | None. |
| May 2, 2005 | IDFPR | 222222/2 | None. |
| May 30, 2006 | FDIC | 222222/2 | None. |
| January 29, 2007 (Visitation) | FDIC | N/A | The purpose of this visitation was to assess asset quality. |
| May 29, 2007 | Joint | 23222/2 | None. |

The FDIC also gave favorable ratings of "2" relating to the quality of Mutual's assets during the relevant time periods.  This stands in stark contrast to the FDIC conclusory allegations that "regulators repeatedly warned" that the management practices and staffing of Mutual were inadequate.  (Compl. ¶ 31.)

---

[5] A courtesy copy of the MLR is provided to the Court as Exhibit 3 to the Memorandum of Law in Support of the Motion to Dismiss of Steven Lakner, Ronald Tucek, Patrick McCarthy, and Paul Pappageorge, filed on January 18, 2012.  The Court can take judicial notice of the MLR, along with the other FDIC publications of public record cited herein, because the MLR is published by the Office of Inspector General, Federal Deposit Insurance Corporation, and is of public record, at http://www.fdicoig.gov/2010reports.asp.  *See* Fed. R. Evid. 201; *Gen. Elec. Cap. Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080–81 (7th Cir. 1997).

The FDIC knew, for years, that Mutual specialized in CRE loans, which included ADC loans. (MLR at 2.) Mutual's CRE and ADC concentrations were largely consistent from 2005 to 2009 and proportional in each year when viewed with respect to the composition of Mutual's loan portfolio. (*See* MLR at 8–9.) ADC loans as a percent of total loans were 25%, 29%, 24%, 23%, and 22%, respectively, during the years 2005 through 2009. (*Id*.) Similarly, CRE loans as a percent of total loans were 49%, 48%, and 50%, respectively, during the years 2007 through 2009. (*Id*.) With those levels of CRE and ADC concentrations in its loan portfolios, Mutual received a 2 rating from 2004 through 2006 both as a composite rating and in all component ratings. (*See* 2006 ROE at 23 and 2007 ROE at 15, specifically noting that CRE loans were within bank limits.) In 2007, when the asset quality component rating decreased from a 2 to a 3, it was primarily due to an increase in adversely classified assets, with three credits comprising 55% of the criticized loans. (*See* 2007 ROE at 1–2.) Nonetheless, Mutual's composite rating, reflecting the Bank's overall condition, remained a 2.

With respect to Mutual's loan policy, the FDIC does not identify flaws or errors within the loan policy itself, a policy that the FDIC reviewed and approved for years. (Compl. ¶¶ 35–37.) The only criticism regarding interest reserves is contained in the after-the-fact MLR (the MLR states that the policy should have provided guidelines on the acceptable usage of interest reserves). (MLR at 5.) However, nowhere in the ROEs were the Veluchamys put on notice of such a requirement by the regulators until after approval of the loans identified in the Complaint.

The FDIC's allegation that the Veluchamys repeatedly ignored warnings from bank examiners regarding weaknesses in Mutual's lending practices is in stark contrast to the ratings of both Mutual and its management in each of the actual examinations. Presumably if the Veluchamys ignored the alleged warnings, the FDIC would not have given such solid ratings.

-13-

Lastly, the regulators' opinions about Mutual's financial condition and its management did not change until the June 2, 2008 examination (after approval had already been given for each loan identified in the Complaint). In the late spring and early summer 2007, the commercial and residential real estate market experienced a severe and unexpected contraction and loss of liquidity. Only after the sudden collapse of the real estate markets did the regulators downgrade Mutual's composite rating and management component rating—for the first time in years—from a 2 to a 4. The impact on Mutual of the "Great Recession" was swift and severe: between the 2007 and 2008 examinations—not as the result of any action or inaction by the Veluchamys—the Bank's adversely classified assets increased from $54 million to $300 million and net charge-offs of CRE loans increased from $8 million at year-end 2007 to $57 million by year-end 2008. (*See* MLR at 1–2.)

As a consequence of the nationwide turmoil in real estate markets and the general weakness of the national economy, the Bank's financial condition became untenable in 2009. However, none of these events, which in fact caused Mutual's failure, can be reasonably or fairly attributed to the Veluchamys. In effect, the FDIC wants to hold the Veluchamys liable for failing to anticipate the Great Recession when the nation's top financial regulators, with far greater resources at their command than the directors of a community bank in suburban Chicago, did not anticipate these same events. Nor does the FDIC allege any plausible basis upon which the Veluchamys could be the cause in fact of the loan "losses" identified in the Complaint, all of which were approved prior to June 2, 2008 (the date of the FDIC's 2008 ROE).

### 4. Approval of Loss Loans

The FDIC seeks to hold the Veluchamys liable for the losses incurred on 12 of Mutual's loans. At most, the Complaint alleges that Mutual entered into loan transactions that resulted in losses to Mutual. Moreover, the FDIC does not allege each defendant's role regarding the

-14-

alleged loan losses, other than identifying which loans they "voted" for. (Compl. ¶ 57.)
However, bank directors are not insurers or guarantors of the profitability of their business
decisions. *Stanley*, 770 F. Supp. at 1310; *Wallach*, 277 Ill. at 233. Moreover, "the duty of the
Board to inform itself before making business decisions does not require that the Board be
intimately familiar with every proposal and fact" as the Complaint incorrectly suggests. *Shaper*,
371 Ill. App. 3d at 1090.

Further, the FDIC's Complaint ignores its own guidelines for approving loans. The
Guidelines for Real Estate Lending identify a number of factors for underwriting consideration,
and the "capacity of the borrower, *or income from the underlying property,* to adequately service
the debt" is only one "relevant credit factor." 12 C.F.R. § 365, App. A.; *see also Lavery v.
Kearns,* 792 F. Supp. 847 (D. Me. 1992) ("It was not unusual banking practice to make
commercial loans for real estate development to developers who did not have strong cash
positions…The Bank had appraisals of [the] properties done and relied on those as an indication
of whether to make the loans, because repayment was expected to come from the developed
property."). In the absence of allegations as to each loan that all of the different underwriting
factors were absent or deficient *and* that the Veluchamys knew of those circumstances, the FDIC
cannot state a plausible claim against them based on the loan approval decisions.

The FDIC also attempts to allege that the Veluchamys' approval of the Loss Loans is
actionable because the loans "were made in violation of" three provisions of the Code of Federal
Regulations (the "CFR"). (Compl. ¶ 58.) However, even if these allegations are true, the CFR
does not bestow upon a shareholder (in whose shoes the FDIC now stands) a cause of action
against bank directors. *See FDIC v. Schuchmann*, 235 F.3d 1217, 1222 (10th Cir. 2000). *Id.*
(citing *Seidman v. OTS*, 37 F.3d 911, 931 (3d Cir. 1994)). Moreover, 12 U.S.C. § 1831p-1

provides specific actions that might be taken by the FDIC should the standards it articulates under the statute not be met. A private cause of action is not one of those remedies.

### 5. Use of Mutual's Capital for Personal Expenses

The FDIC asserts that the Veluchamys breached fiduciary duties owed to the bank by using Mutual's capital for personal expenses. This assertion is merely an attempt to inject inflammatory remarks to mask the FDIC's inability to state a claim. For an expenditure to be considered a "waste," it must be "an exchange that is so one-sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *See Oakland County Empl. Ret. Sys. v. Massaro*, 736 F. Supp. 2d 1181, 1187–88 (N.D. Ill. 2010) (*quoting In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 74 (Del. 2006)). Moreover, "[a] plaintiff attacking a corporate payment has the heavy burden of demonstrating that no reasonable businessman could find that adequate consideration had been supplied for the payment." *Cohen v. Ayers*, 596 F.2d 733, 739 (7th Cir. 1979); *see also Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) (holding that a corporate waste claim must fail if "there is any substantial consideration received by the corporation").

The FDIC references four categories of alleged "wasteful use of Mutual Bank funds" that it claims constitute a breach of the Veluchamys' fiduciary duties: (1) compensation paid to Mahajan that he allegedly put toward his wife's legal fees; (2) payment for a Board meeting in Monte Carlo; (3) payment to sponsor a "Mutual Bank function" that included Arun Veluchamy's wedding; and (4) payments to contractors, whom the FDIC alleges were controlled by relatives of Regas and Mahajan, for renovations to the Bank's offices. (*Id.* ¶¶ 109-113, 170.) While the FDIC tersely characterizes these items as "personal expenses," it does not provide sufficient "further factual enhancement" to support this "label[] and conclusion[]." *Iqbal*, 129 S.Ct. at 1949.

-16-

### 6. Approval of Dividend Payments

The FDIC's allegations that the Veluchamys illegally approved dividends are baseless and contradict the FDIC's own publicly available data. The following table based on information from the FDIC's website shows the Bank's dividend distribution history relative to its undivided profits and its relative health:[6] [7]

| Mutual Bank (FDIC Certificate #: 18659) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Year: | 2007 | | | | 2008 | | | |
| Quarter: | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Report Date: | 3/31/2007 | 6/30/2007 | 9/30/2007 | 12/31/2007 | 3/31/2008 | 6/30/2008 | 9/30/2008 | 12/31/2008 |
| Undivided Profits: | $ 23,846,000.00 | $ 16,988,000.00 | $ 23,573,000.00 | $ 31,437,000.00 | $ 36,469,000.00 | $ 11,155,000.00 | $ 6,349,000.00 | $ (42,174,000.00) |
| Quarterly Cash Dividends (Declared on Common Stock): | $ 525,000.00 | $ 5,150,000.00 | $ 3,625,000.00 | $ 650,000.00 | $ - | $ 1,062,000.00 | $ - | $ - |
| Quarterly Dividends as a Percent of Undivided Profits: | 2.20% | 30.32% | 15.38% | 2.07% | 0.00% | 9.52% | 0.00% | 0.00% |
| Year-to-Date Cash Dividends (Declared on Common Stock): | $ 525,000.00 | $ 5,675,000.00 | $ 9,300,000.00 | $ 9,950,000.00 | $ - | $ 1,062,000.00 | $ 1,062,000.00 | $ 1,062,000.00 |
| Core Capital (Leverage) Ratio (3 or 4% Minimum): | 9.36% | 8.71% | 8.54% | 8.36% | 8.47% | 7.24% | 7.07% | 4.16% |
| Tier 1 Risk-Based Capital Ratio (4% Minimum): | 10.35% | 10.03% | 9.35% | 9.61% | 9.20% | 7.50% | 7.50% | 4.64% |
| Total Risk-Based Capital Ratio (8% Minimum): | 11.45% | 11.27% | 10.60% | 10.52% | 10.19% | 8.76% | 10.53% | 7.75% |

Pursuant to the Illinois Banking Act, a state bank's board of directors may declare dividends out of "net profits." 205 ILCS 5/14(8)(a). The statute also provides that until the bank's "surplus" account is at least equal to the bank's "capital" account, the bank must transfer 10% of its profits to its "surplus" account. *Id.* Lastly, the Act prohibits dividend distributions in

---

[6] The "minimum" ratios expressed in the bottom 3 rows of the table illustrate the minimum ratios the Bank must have in order to not be deemed "undercapitalized." 12 C.F.R. § 325.103(b)(2), (3). An "undercapitalized" bank may not make any capital distributions. 12 U.S.C. § 1831o(d)(1).

[7] The Court can take judicial notice of the data on the FDIC's website because it is collected, published, and maintained by the Federal Deposit Insurance Corporation, and is of public record. *See* Fed. R. Evid. 201; *Gen. Elec. Cap. Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080–81 (7th Cir. 1997) (court can take judicial notice of documents of public record on a motion to dismiss).

the amount greater than what the bank has in its "net profits" account after first deducting losses and bad debts.[8] *Id.*

The FDIC alleges that the Veluchamys wrongfully approved dividend distributions of approximately $10.5 million to the Bank's holding company in 2007. (Compl. ¶ 116). However, as set forth in the table above, the FDIC's own data shows the Bank distributed dividends in five of the eight quarters of 2007 and 2008, and in none of those five quarters did the Bank have a negative "undivided profits" account. Rather, the largest dividend distributed (Q2 of 2007) made up only 30% of that quarter's "undivided profits."[9]

### D. The FDIC Fails To Adequately Allege Gross Negligence Under FIRREA

While Illinois law does not recognize a cause of action for gross negligence, such a claim is nonetheless created by FIRREA. The precise standard, however, is to be determined by Illinois' definition of "gross negligence." *See* 12 U.S.C. § 1821(k); *Franz*, 909 F. Supp. at 1139. The definition of "gross negligence" under Illinois law is unsettled. Most recently, the Northern District, in *Spangler*, glossed over any uncertainty surrounding the appropriate definition of gross negligence, quoting from only a single case for the proposition that, under Illinois law, "gross negligence has been defined as 'very great negligence,' but something less than willful, wanton and reckless conduct." 2011 WL 6754022, at *5 (quoting *FDIC v. Gravee*, 966 F. Supp. 622, 636 (N.D. Ill. 1997)).

In *Franz*, however, the Northern District conducted a rigorous analysis of potential definitions for gross negligence under Illinois law. 909 F. Supp. 1128, 1140–41. It was determined that the best definition of gross negligence was "recklessness." The *Franz* court

---

[8] Bad debts are defined as those in which interest is past due and unpaid for a period of 6 months or more, unless the loan is secured and in the process of collection. *Id.*

[9] The FDIC appears to be relying (incorrectly) on year-to-date data in the Complaint.

cited multiple Illinois cases for the proposition that "gross negligence must mean something less than intent and something more than negligence." *Id*. at 1140. Upon further inquiry into Illinois law, the *Franz* court determined that gross negligence equals recklessness. *Id*. (*citing, e.g.*, *People v. Khan*, 136 Ill. App. 3d 754, 758 (1st Dist. 1985) ("[t]he term[ ] . . . "gross negligence" [is] the historical predecessor[ ] of the term 'recklessness' and [they] have the same meanings")). The *Franz* court further noted that "[d]efining gross negligence as recklessness is consistent with horn book law." 909 F. Supp. at 1141 (citing William Prosser, The Law of Torts § 34 (4th ed. 1971)). The decision in *Franz* is not a mere aberration. Indeed, in a subsequent RTC case, the Northern District applied the same definition of gross negligence, stating that "this Court held that Illinois courts would define gross negligence as recklessness." *RTC v. O'Connell*, No. 94 C 4186, 1996 WL 153866, at *3 (N.D. Ill. Mar. 29, 1996). This definition has continued to be applied by the Northern District. *See, e.g.*, *In re Berg*, 387 B.R. 524, 567 (Bankr. N.D. Ill. 2008) (under Illinois law, gross negligence is recklessness); *Rush Univ. Med. Ctr. v. Minnesota Mining & Mfg. Co.*, No. 04 C 6878, 2007 WL 4198233, at *4 (N.D. Ill. Nov. 21, 2007) ("Illinois law defines 'gross negligence' . . . as recklessness."); *IMR USA, Inc. v. GES Exposition Servs., Inc.*, No. 04 C 100, 2005 WL 736589, at *5 n.2 (N.D. Ill. Mar. 31, 2005) ("In Illinois, 'gross negligence' [and] 'recklessness' . . . are synonymous.").

Moreover, to the extent that a genuine conflict exists as to the definition of "gross negligence," Delaware law is instructive. Delaware law "employs a strict definition of gross negligence," requiring, "[i]n the corporate context . . . [that] a plaintiff must prove that the defendant acted with a 'devil-may-care attitude or indifference to duty *amounting to recklessness*.'" *Peregrine Emerging CTA Fund, LLC v. Tradersource, Inc.*, No. 07 C 5528, 2008 WL 474369, at *7 (N.D. Ill. Feb. 19, 2008) (quoting *Albert v. Alex. Brown Mgmt. Servs., Inc.*,

2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005)) (emphasis added). Thus, the FDIC's statutory gross negligence claim should be governed by a "recklessness" standard.

Under Illinois law, recklessness "denotes 'a course of action which . . . shows an utter indifference to or a conscious disregard for a person's own safety and the safety of others.'" *Franz*, 909 F. Supp. at 1141 (quoting *Ziarko v. Soo Line R.R.*, 161 Ill. 2d 267, 279 (1994)). Illinois case law provides an example: "The pointing of a loaded revolver at another is such a gross deviation from the standard of care which a reasonable person would exercise that it constitutes recklessness." *People v. Bauman*, 34 Ill. App. 3d 582, 589 (1st Dist. 1975).

Here, the FDIC has failed to allege facts which, tantamount to pointing the proverbial loaded gun, show the requisite utter indifference or conscious disregard of a duty owed to Mutual. Count I seeks to hold the Veluchamys liable for gross negligence in approving the Loss Loans. However, the FDIC has failed to plead facts indicating that the Veluchamys exhibited utter indifference when voting to approve the loans, or conscious disregard for the bank's safety. As noted above, the Veluchamys did not owe a duty to "be intimately familiar with every proposal and fact." *Shaper*, 371 Ill. App. 3d at 1090.

Moreover, under the Illinois Banking Act, the Veluchamys were entitled to rely upon "advice, information, opinions, reports or statements, including financial statements and financial data, prepared or presented by (1) one or more officers or employees of the bank whom the director believes to be reliable and competent in the matter presented." 205 ILCS § 5/16. None of the FDIC's allegations provides any basis for concluding that the Veluchamys were wrong to rely upon the loan write-ups recommending the loans, or that they were grossly negligent in doing so. There are no allegations that the Veluchamys knew or were reckless in not knowing that the information in the loan-write up was purportedly incorrect or somehow deficient. To the

-20-

contrary, the FDIC's allegations make clear that the criticisms are based upon facts not discovered until after the loans were made, when market conditions had greatly changed. Consequently, Count I must be dismissed.

### E.     The FDIC's Duplicative Claims Should Be Dismissed

Counts II and III of the Complaint are duplicative of Count VIII (and vice versa) and must be dismissed.  Under Illinois law, causes of action alleging the same facts and injury may be dismissed as duplicative on a 12(b)(6) motion to dismiss.  *See, e.g.*, *Beringer v. Standard Parking O'Hare Joint Venture*, Nos. 07 C 5027, 07 C 5119, 2008 WL 4890501, at *5 (N.D. Ill. Nov. 12, 2008).  Merely cloaking identical causes of action with distinct titles (negligence / breach of fiduciary duty / failure to supervise) does not prevent them from being duplicative. The FDIC ran into this problem in *Spangler* and *Saphir*, having its duplicative negligence and breach of fiduciary duty claims dismissed.  *See, e.g.*, *Spangler*, 2011 WL 6754022, at *12; *Saphir*, 2011 WL 3876918, at *9.  Here, the FDIC has attempted to surreptitiously avoid this problem by presenting multiple alternatively-pled claims.  The FDIC has pleaded Count III (negligence) in the alternative to Count II (breach of fiduciary duty).  (Compl. ¶ 152.)  Thus, between Counts II and III, only one will ultimately progress to later stages of litigation.

In Count VIII, the FDIC asserts a cause of action for both negligence *and* breach of fiduciary duty for "failure to supervise," but it bases its claims on the same duties allegedly breached in Counts II and III.  (*Id.* ¶¶ 177–81.)  The FDIC pleads Count VIII's negligence and breach of fiduciary duty claims in alternative to each other.  (*Id.* ¶ 177.)  Consequently, if Count VIII were to survive the Veluchamys' Motion to Dismiss, it would progress into the later stages of litigation as either a negligence claim or a breach of fiduciary duty claim based on the same facts relied on in Counts II and III.  Thus, the FDIC will be left with two negligence claims on the same facts, two breach of fiduciary duty claims on the same facts, or negligence and breach

of fiduciary duty claims on the same facts. Regardless of the outcome, at least one of the causes of action must be dismissed as duplicative under Rule 12(b)(6).

It is clear that Counts II, III, and VIII meet the same facts/injury standard for dismissal as duplicative. First, each of the three Counts alleges the same facts. Counts II and III, because they are pleaded in the alternative, literally allege identical breaches: that the Veluchamys, *inter alia*, failed to conduct due diligence on loans, approved loans in violation of Mutual's policies, failed to ensure safe and sound loan underwriting, failed to minimize Mutual's risk of loss on its loans, failed to ensure the loans did not create unsafe and unsound credit concentrations, and ignored regulatory warnings about Mutual's lending operations. (Compl. ¶¶ 149, 155.) Count VIII alleges that the Veluchamys, *inter alia*, permitted an overly aggressive and risky loan growth strategy, failed to enforce Mutual's loan policies, failed to correct poor underwriting practices, permitted overconcentration in risky loans, failed to correct credit administration practices, and ignored regulatory warnings about Mutual's lending operations. (Compl. ¶ 178.)

Second, the "same injury" component is easily established here. Counts II, III, and VIII each seek to recover damages stemming from the Veluchamys' approval of certain loans, and they even allege an identical amount of losses: $115 million. (Compl. ¶¶ 150, 156, 181.)

The duplicative nature of Counts II and III and Count VIII is also supported by case law. *See, e.g.*, *Edgewater Med. Ctr. v. Rogan et al.*, No. 04 C 3579, 2010 WL 2711448, at *6 (N.D. Ill. July 6, 2010) (identifying breach of fiduciary duty and failure to supervise as the same cause of action in a plaintiff's complaint); *Nat'l Am. Ins. Co. v. Indiana Lumbermens Mut. Ins. Co.*, No. 97 C 5431, 1999 WL 35339, at *10 (N.D. Ill. Jan. 13, 1999) (acknowledging that defendants "had a fiduciary duty to supervise"); *FDIC v. Greenwood*, 739 F. Supp. 450, 451 (C.D. Ill. 1989) (included in a bank director's "[d]uty to exercise that degree of care which a reasonably prudent

director" would is a "duty to exercise reasonable supervision over officers of the bank"). Thus, either Counts II and III or Count VIII must be dismissed.

## V.  **IMMATERIAL ALLEGATIONS SHOULD BE STRICKEN**

Under the Federal Rules of Civil Procedure courts are authorized to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The purpose behind such a motion is "to exclude irrelevant material from pending litigation." *Murphy v. Capital One Bank*, No. 08 C 801, 2008 WL 3876138 (N.D. Ill. Aug. 18, 2008). Motions to strike "may be granted if they remove unnecessary clutter from the case and serve to expedite, not delay." *Holzer v. Prudential Equity Group LLC*, 520 F. Supp. 2d 922, 928 (N.D. Ill. 2007). Additionally, motions to strike will be granted where "the pleading causes some prejudice to the party bringing the motion." *Id.*; *see also Irshad Learning Ctr. v. County of DuPage, et al.*, No. 10 C 2168, 2011 WL 1225459, at *20 (N.D. Ill. Mar. 28, 2011).

Here, the FDIC's Complaint contains immaterial and impertinent matter about the alleged acts and/or omissions of the Veluchamys. Specifically, this matter appears in Paragraphs 109–113 and 166–171, and—as shown above—concerns actions unrelated to any duties owed to Mutual by the Veluchamys. These allegation are not necessary for the FDIC to plead its claims and are designed to portray the Veluchamys in a negative light in what could be deemed a highly incendiary manner in light of the passionate feelings stirred up by the "Great Recession."

The FDIC's Complaint also contains prejudicial nonparty statements that should be stricken. Specifically, the Complaint makes reference to statements made by Pethinaidu Veluchamy—a nonparty—in relation to an entirely separate lawsuit. (Compl. ¶ 34.) This statement serves no legitimate interest in this case.

-23-

## VI.    <u>CONCLUSION</u>

For all the foregoing reasons, Defendants Arun and Anu Veluchamy respectfully request that this Court grant their Motion to Dismiss/Strike the FDIC's Complaint.

Dated:  January 18, 2012

Respectfully submitted,

VEDDER PRICE P.C.

By:    */s/ Joshua Nichols*
Randall M. Lending 06198407
Chad A. Schiefelbein
Joshua Nichols
222 North LaSalle Street
Suite 2600
Chicago, Illinois  60601-1003
+1 (312) 609-7500
+1 (312) 609-5005

-24-

## CERTIFICATE OF SERVICE

I, Joshua Nichols, an attorney, hereby certify that I electronically filed the foregoing **DEFENDANTS ARUN AND ANU VELUCHAMY'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS/STRIKE THE FDIC'S COMPLAINT** with the Clerk of the Court using the CM/ECF system which will send notifications of such filing to the following:

| | |
|---|---|
| Beth Anne Black | blackb@gtlaw.com |
| Dean J. Polales | djpolales@uhlaw.com |
| F. Thomas Hecht | fthecht@uhlaw.com |
| Jeffrey R. Tone | jtone@kattentemple.com |
| Kimberly Elizabeth Blair | kimberly.blair@wilsonelser.com |
| Michael P. Tone | michael.tone@wilsonelser.com |
| Richard Henry Tilghman | rhtilghman@uhlaw.com |
| Shannon Tierney Murphy | murphys@gtlaw.com |
| Steven Marc Malina | malinas@gtlaw.com |
| Tina B. Solis | tbsolis@uhlaw.com |
| Nancy A. Temple | ntemple@kattentemple.com |
| John M. George, Jr. | jgeorge@kattentemple.com |
| Michael S. Loeffler | michael.loeffler@ltt-legal.com |
| Kim Ruckdaschel-Haley | kruckdaschel-haley@lindquist.com |
| Susan E. Barnes | sbarnes@lindquist.com |
| Todd H. Thomas | todd.thomas@ltt-legal.com |
| Edward Fitzsimmons Dunne | efdunne@karballaw.com |
| Newton C. Marshall | nmarshall@karballaw.com |

On: January 18, 2012

s/ Joshua Nichols