IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE | ) | |
| CORPORATION AS RECEIVER FOR | ) | |
| MUTUAL BANK, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 11 C 7590 |
| | ) | |
| AMRISH MAHAJAN, PETHINAIDU | ) | Judge Virginia M. Kendall |
| VELUCHAMY, PARAMESWARI | ) | |
| VELUCHAMY, ARUN VELUCHAMY, ANU | ) | |
| VELUCHAMY, STEVEN LAKNER, RONALD | ) | |
| TUCEK, PATRICK MCCARTHY, PAUL | ) | |
| PAPPAGEORGE, RICHARD BARTH, | ) | |
| THOMAS PACOCHA, JAMES REGAS, REGAS, | ) | |
| FREZADOS & DALLAS LLP | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Federal Deposit Insurance Corporation ("FDIC") as receiver for Mutual Bank (the "Bank") sued twelve individuals, ten members of the Board of Directors (the "Board") of the Bank (together, the "Director Defendants"), and two former officers of the Bank (the "Officer Defendants"). The FDIC also brought claims against the Bank's lawyer, James Regas (also a Director Defendant) and his law firm (the "Regas Firm"). The FDIC alleged gross negligence, negligence, breach of fiduciary duty, wasting of corporate assets and, in the case of Regas and the Regas Firm, claims of malpractice and aiding and abetting the other Defendants' breach of fiduciary duty. The claims arise as a result of the Bank's loss of $115 million and subsequent business failure, allegedly as a result of risky construction and commercial real estate loans and the improper expenditure of corporate assets for personal use by the Defendants. Each of Defendants moves to

dismiss the claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth herein, the motions are granted in part and denied in part.

**Undisputed Facts**

For purposes of a motion to dismiss, the Court accepts as true all well-pleaded allegations in the First Amended Complaint. Beginning in 2004, the Bank grew its loan portfolio rapidly with a concentration in commercial real estate ("CRE") and in acquisition, construction, and development ("ADC") loans. In 2007, the ADC loans represented 209% of the Bank's capital; by 2009, ADC loans represented 819%. By comparison, other peer group banks decreased their exposure to ADC loans from 147% in 2007 to 129% in 2009. In 2007, the Bank held CRE loans accounting for 415% of the Bank's total capital; by 2009, CRE loans accounted for 1,855% of total capital. By comparison, peer group banks had CRE exposure of 302% in 2007, and 205% in 2009. Additionally, the Bank concentrated its loan portfolio in a small number of customers, increasing loan amounts to its fifteen largest borrowers from $294.2 million in 2007 to $428.6 million in the fall of 2008.

A. The Bank's Loan Policy and Regulatory Exam History

On paper, the Bank maintained an extensive loan policy, requiring underwriting in conformity with state and federal law, extensive documentation, and evaluation of risk. According to the Bank's loan policy, loans in excess of the individual officers' lending limits, but under $1 million, required the approval of the Senior Officer Loan Committee (the "SOLC") and loans in excess of $1 million required the approval of the Directors' Loan Committee (the "DLC")

comprising members of the Bank's Board. In reality, Defendants repeatedly ignored the Bank's loan policy.

In May 2005, the Illinois Department of Financial and Professional Regulations (the "IDFPR") conducted an examination of the Bank and delivered its report to the Board on June 10, 2005. That report warned the Board that its high concentration in hotel loans carried more risk than other properties, and that many of the loans the Bank extended were inappropriately based on projections rather than historical data and/or had collateral consisting of distressed properties. The 2005 report also noted that many of the properties securing gas and convenience store loans were difficult for the Bank to monitor for collateral purposes as they were outside the Bank's immediate market area. As a result of the 2005 report, IDFPR regulators made several recommendations to manage risk, yet these recommendations were not followed by the Bank.

In May 2006, the FDIC investigated the Bank and delivered its report to the Board on July 29, 2006. The 2006 report again raised concerns about the Bank's risk management, record asset growth, and lack of increase in staffing to keep pace with the increase in the loan portfolio. The 2006 report also stressed the geographic dispersion of properties subject to loans, and potential flaws with asset quality. As with the 2005 report, the 2006 report made recommendations to enhance risk management which were again not followed by the Bank.

In May 2007, the IDFPR and the FDIC jointly investigated the Bank and delivered their joint report to the Board on June 27, 2007. The 2007 report noted continued deterioration in the Bank's loan portfolio and in asset quality, highlighted risk concerns with the gas, convenience store, and hotel markets, the geographic dispersion of properties outside the local market, and the reliance

upon aggressive and speculative appraisals. The 2007 report also noted staffing concerns hampering accurate loan review. As with the 2005 and 2006 report, regulators made recommendations to enhance risk management, and again, these recommendations were not followed by the Bank.

In June 2008, the IDFPR and the FDIC again jointly investigated the Bank and delivered their report to the Board on July 30, 2008. The 2008 report contained a harsh description of the Bank's financial condition, the risk management practices, and noted the "rapid" deterioration of asset quality resulting in severe exposure for the Bank. Regulators warned the Board that the Bank needed to significantly improve its risk monitoring and reporting, secure adequate staffing, and change credit administration practices that, if not altered, presented "an imminent threat to the institution's viability." Cmplt at ¶50. Regulators invited the Board to participate in exam discussions, but none of the Board did so. When regulators invited Defendant Pethinaidu Veluchamy, then Board Chairman, to attend an individual meeting to discuss the 2008 report and exam, he elected not to attend. As a result of the 2008 report, the Bank entered into a Cease and Desist Order with the FDIC, effective January 9, 2009.

In January 2009, the FDIC conducted an additional exam of the Bank to evaluate the asset quality and Bank operations as of the end of 2008. Regulators noted no improvement in Bank management's ability to properly identify and reserve for risk, and that the Bank's financial condition had deteriorated to the point where the Bank's future was in question. The IDFPR closed the Bank on July 31, 2009.

B.  The Twelve Loss Loans

Of the loans made and approved by the Director and Officer Defendants, twelve loans (the "Loss Loans" caused losses totaling $115.4 million.  The Defendants routinely failed to assess the repayment abilities of the borrowers on the Loss Loans, relied on loan brokers who brought high risk loans to the Bank, made loans out of area, inappropriately allowed the use of the Loss Loans' interest reserves, and failed to monitor the use of the funds of the state of the collateral securing the Loss loans.   Although most of the Loss Loans were made after the real estate market began its decline in 2006, the Loss Loan files make no more than casual references to deteriorating market conditions.

C.  Personal Use of Bank Corporate Assets

The Director and Officer Defendants used funds of the Bank for personal use, including: (i) a $250,000 payment for sponsorship of Defendant Arun Veluchamy's wedding in July 2008; (ii) $495,000 in payments to Defendant Mahajan for defense of his wife's criminal case for Medicaid fraud, only $202,560 of which was repaid to regulators; (iii) payments for renovations of the Bank's offices made by friends and relatives of the Director Defendants, which payments exceeded the value of the improvements by approximately $250,000; and (iv) payments of approximately $300,000 for a Board meeting in Monte Carlo, for which no business-related function is apparent. In additional to Bank expenditures for personal use, the Bank paid improper dividends to the Director Defendants in the amount of $10.5 million in 2007 and 2009.  The dividends were authorized by the four Veluchamy Defendants (who collectively held 95% of the shares of the Bank) for their benefit, and to a lesser degree, for the benefit of Defendant Mahajan.  The Dividends were

approved at a time when the Bank was in poor financial condition with insufficient loss reserves and capital base.

### D.  Regas and Regas Firm Allegations

Defendant James Regas was a Board member and also the Bank's principal legal counsel. Regas and the Regas Firm represented the Bank in loan transactions, served as the Board's general counsel, counseled the Bank regarding regulatory compliance, and actively participated in discussions with regulators with awareness of the Board's conduct and the risk it posed to the Bank.  Between January 2007 and April 2009, the Bank paid the Regas Firm $3,094,194 for legal services.  Despite warnings from regulators during the repeated investigations of the Bank, Regas and the Regas Firm facilitated as counsel three loans in 2008 to hotel developers that were risky for the Bank, totaling $70.65 million.  The Regas Firm proceeded to close these transactions without advising the Bank of the associated risks and without conducting any significant due diligence. The losses on these three transactions now exceed $44 million.

Additionally, Defendant Regas was owner and Chairman of the Board of Western Springs National Bank and Trust ("Western Springs") in addition to being a member of the Board of the Bank.  In his position at Western Springs, he made a loan to finance the purchase of property being sold by a personal friend of Regas.  After making the loan through Western Springs, Regas arranged for the sale of a majority participation in that loan to the Bank, thereby shifting the risk of the loan from Western Springs to the Bank.  Regas neither advised the Bank of the risk of the transaction, nor abstained from voting in favor of the participation.

**Legal Standard**

When considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all facts alleged in the complaint and construes all reasonable inferences in favor of the non-moving party. *See Killingsworth v. HSBC Bank*, 507 F.3d 614, 618 (7th Cir. 2007). To properly state a valid claim, the complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Detailed factual allegations" are not required, but the plaintiff must allege facts that, when "accepted as true ... 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To determine whether a complaint meets this standard the "reviewing court [must] draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 678. If the factual allegations are well-pleaded, the Court assumes their veracity and then proceeds to determine whether they plausibly give rise to an entitlement to relief. *Id* at 679. A claim has facial plausibility when its factual content allows the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *See id.* at 678.

**Discussion**

The Defendants, in various combinations, have filed seven motions to dismiss the Amended Complaint. However, many of the arguments made by various Defendants overlap, and most of the Defendants have adopted and/or joined in the arguments of the other Defendants. The FDIC has filed a single consolidated response. In light of the duplicative arguments between Defendants, the Court addresses the sufficiency of the eleven-count Amended Complaint by addressing each

7

Count in turn, followed by the applicability of several affirmative defenses alleged against one or more counts.

   A.    *Claims for Gross Negligence, Negligence, and Breach of Fiduciary Duty Against Director Defendants for Approval of the Loss Loans*

Counts I through III of the Amended Complaint allege that the Director Defendants and the Officer Defendants acted were grossly negligent under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), as well negligent and in breach their fiduciary duty to the Bank under Illinois state law, when they approved some or all of the twelve Loss Loans detailed in the Amended Complaint. The Director Defendants have moved to dismiss these claims on grounds that the FDIC's allegations are vague and amount to a strict liability standard, as the Amended Complaint does not allege that specific losses are tied to specific directors, and on the basis of the application of certain affirmative defenses discussed below.

Section 1821(k) of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") provides that individual officers and directors of a bank may be held personally liable for loss or damage to the bank caused by the officers' and directors' "gross negligence," as defined by state law. *See* 12 U.S.C. 1821(k). Courts in this district have agreed that Illinois law permits claims for both negligence and gross negligence. *See, e.g. FDIC v. Spangler*, – F. Supp. 2d –, 2011 WL 6754022 (N.D. Ill. Dec. 22, 2011) (Dow, J.); *FDIC v. Saphir*, 2011 WL 3876918 (N.D. Ill. Sept. 1, 2011) (Pallmeyer, J.). Illinois law claims involving negligence, gross negligence, and breach of fiduciary duty have similar elements. For each claim, the FDIC must allege duty, breach of that duty, proximate cause, and damages. *See Spangler*, 2011 WL 6754022 at *4 (collecting Illinois cases). For a negligence claim against Defendants, plaintiff must plead violation of a standard of care "which

ordinarily prudent and diligent persons would exercise under similar circumstances." *FDIC v. Bierman*, 2 F.3d 1424, 1427 (7th Cir. 1993). Courts in this district agree, in reliance upon the Illinois Supreme Court's ruling in *Massa v. Department of Registration and Education*, 507 N.E.2d 814, 819 (Ill. 1987), that gross negligence is greater than ordinary negligence, but falls short of willful, wanton, or reckless conduct. *See, e.g.,FDIC v. Gravee*, 966 F. Supp. 622, 636-37 (N.D. Ill. 1997); *Spangler*, 2011 WL 6754022 at *5 (citing *Gravee* discussion); *Saphir*, 2011 WL 3876918 at *6 (same).

Taking the facts in the Amended Complaint as true, the FDIC has sufficiently pleaded causes of gross negligence under FIRREA, negligence and breach of fiduciary duty. The FDIC has alleged that the Director Defendants and Officer Defendants owed the Bank a duty to "use reasonable care, skill and diligence in the performance of their duties" including duties related to proper due diligence on loans, complying with the Bank's loan policies, ensuring loans were secured with sufficiently valuable collateral and did not violate applicable laws and regulations or credit unsound concentrations of credit. To the extent that certain Defendants allege that the Amended Complaint lacks specificity as to each Defendant's role in approving the Loss Loans, the FDIC has pleaded that the Director Defendants breached their duty by approving some or all of twelve specific loans, has described each of the Loss Loans in detail, and has included in the Amended Complaint a chart showing which Director Defendants and Officer Defendants voted to approve each of those Loss Loans. With the inclusion of such details, each of the Director Defendants and Officer Defendants cannot claim that he or she lacks adequate notice of the charges brought by the FDIC.

With respect to certain Defendants' arguments that the Amended Complaint holds Defendants to an improper "strict liability" standard of care with respect to negligence claims, at the pleadings stage, the FDIC has alleged specific conduct by the Director Defendants and Officer Defendants in respect of their particular actions as directors and officers of the Bank, in the face of repeated reports and warnings by regulators that the Bank had approved risky loans in problematic economic sectors, with insufficient staffing to monitor those loans and their associated collateral. Greater than ordinary care is needed when directors and officers have received notice of problems with a bank's operations.  *See FDIC v. Bierman*, 2 F.3d at 1433.  The FDIC has alleged numerous years of investigations of the Bank and reporting of alarming results of those investigations to the Director Defendants, by both the IDFPR and the FDIC.   As described in the Amended Complaint, those reports went unheeded by the Director Defendants, who continued to make risky loans up until the time of closure.

Likewise, with respect to various Director Defendants' arguments that the allegations in the Amended Complaint can be attributed to the declining market generally, it is too early in the litigation to make any such determination.   Taking the FDIC's allegations in the Amended Complaint as true, the Director Defendants repeatedly ignored warnings from regulators about the rapid growth of loans in risky market sectors, and the lack of oversight at the Bank of both loan approvals and collateral maintenance and valuation, such that it is far from clear at this state of the proceedings that the Bank's subsequent failure and loss can be attributed solely to recessionary market forces.   The Amended Complaint does not allege, or attempt to hold Director Defendants

accountable, for failing to read the economic tea leaves; rather, the FDIC has alleged specific negligence by the Defendants in approving and monitoring loans.

With respect to the arguments of the Officer Defendants that they lacked the necessary authority to make "final" approvals of the Loss Loans, such defenses are insufficient to dismiss the allegations specifically pleaded against them by the FDIC. The Officer Defendants have been charged only in Counts I through III of the Amended Complaint, each regarding the Officer Defendants' failures to provide an adequate standard of care regarding the Loss Loans. The FDIC's allegations against the Defendants are founded upon the claim that directors' and officers' standard of care rises above the level of "ordinary care and prudence in the administration of the affairs of a bank" when the circumstances dictate greater attention or action. *Bierman*, 2 F.3d at 1433. Specifically, the standard shifts to create a "heightened responsibility among those directors who have an inkling of trouble brewing." *Id*. The Officer Defendants improperly characterize the allegations in the Amended Complaint based entirely upon knowledge of the regulatory reports, which reports the Amended Complaint does not allege were shared with anyone other than the Director Defendants. However, the Amended Complaint sufficiently alleges that each approval of a Loss Loans by the SOLC was itself a breach of the appropriate standard of care and evidenced routine disregard for the Bank's loan policy requirements. By way of example, the Muer Management loan was secured by property already in foreclosure proceedings, and the diligence file contained no analysis of the borrowers' or guarantors' ability to repay the loan. The Shubh Hotels Boca, LLC loan was used to refinance an loan already in default, but no additional collateral was obtained, and the borrower had not received the required permits to complete construction

11

upon the property for which the loan was extended. The Standard Property Development, LLC loan file contained severe deficiencies, including that the principal borrower already had extensive loans with other institutions that were secured by other properties in financial distress. The FDIC has pleaded sufficient details as to the failings of each of the Loss Loans in which the Officer Defendants were involved to give them notice that have been charged with breach of the appropriate standard of care.

Finally, FDIC has pleaded Director Defendants' breach in approving the Loss Loans proximately caused losses to the Bank in the amount of at least $115 million. The FDIC has also appropriately pleaded Count II (breach of fiduciary duty) in the alternative to Count III (negligence). *See Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011) (noting that Fed. R. Civ. P. 8 permits alternative pleading for the same set of operative facts so long as the plaintiff pleads such that the defendant can infer the pleading is in the alternative).

**B. *Claims for Breach of Fiduciary Duty and Breach of Loyalty related to Dividend Payments (Counts IV and V) and Wasting of Corporate Assets (Count VI)***

The FDIC has alleged breach of fiduciary duty against all Director Defendants for approving the Dividends and for waste of corporate assets on personal expenditures, and has alleged a separate claim for breach of the duty of loyalty against solely the Veluchamy Defendants and Mahajan for causing the Bank to make the Dividends from which those Defendants personally profited.

12

The FDIC alleges with specificity that the Director Defendants approved $10.5 million in dividends for the benefit of certain of the Director Defendants at a time when the Bank and the Board had been placed on notice from repeated regulatory visits and reports that the financial condition of the Bank was unsound, specifically in the areas of understated loss reserves and overstatement of income. The FDIC has also alleged with specificity certain expenses payments approved by the Board for personal use by certain Director Defendants and their families, including Bank funds expended for Director Defendant's wedding, for legal fees of a Director Defendant's wife, and for unnecessary board meetings in distant locations. Taking such allegations as true, the FDIC has pleaded sufficiently specific allegations to put the Director Defendants on notice that they breached their fiduciary duties and wasted corporate assets, and has put the Veluchamy and Mahajan Defendants on notice of a breach of loyalty for the acceptance of the Dividends under the conditions as described.

C.    *The Application of the Business Judgment Rule and/or the Illinois Banking Act, 205 ILCS 5/39*

Many of the Defendants argue that the FDIC's state-based claims regarding the Director and Officer Defendants (Counts II, III, IV, V, VI, and VIII) must be dismissed for failure to plead around the affirmative defense of the business judgment rule and/or the Illinois Banking Act. The business judgment rule "applies to protect directors who have performed diligently and carefully and have not acted fraudulently, illegally, or otherwise in bad faith." *Treco, Inc. v. Land of Lincoln Sav. and Loan*, 749 F.2d 374, 377 (7th Cir. 1984). In Illinois, the rule "is a presumption that directors of a corporation make business decisions on an informed basis, in good faith, and with the honest belief that the course taken was in the best interest of the corporation. *Ferris Elevator Co., Inc.*, 674 N.E.2d

13

449, 452 (Ill. App. 1996) (citing *Diederich v. Walters*, 65 Ill. 2d 95 (1976). The Illinois Banking Act, 205 ILCS 5/16(7)(b) provides that banking directors may rely on the advice and reports of officers, if such reliance is in good faith after reasonable inquiry, without knowledge that the reliance is unreasonable.

Other courts in this district court are not in agreement as to whether the business judgment rule and the Illinois Banking Act, both affirmative defenses, should be addressed at the pleadings stage in light of the United States Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *See Saphir*, 2011 WL 3876918 at *5 (not addressed at pleadings stage); *Spangler*, 2011 WL 6754022 at *10 (addressed at pleadings stage). With respect to those portions of the Motions to Dismiss that seek to introduce evidence outside the pleadings in order to dismiss the case at this stage based upon the Illinois Banking Act, this Court agrees with the *Saphir* interpretation of the Illinois Banking Act as an affirmative defense, consideration of which is premature at the pleadings stage. *See Saphir*, 2011 WL 3876918 at *5 (overruling consideration of the Illinois Banking Act and related documentation during consideration of a motion pursuant to 12(b)(6)).

This Court need not reach the issue in any detail, however, because even if the business judgment rule and the Illinois Banking Act could be addressed at the pleadings stage, the FDIC has adequately pleaded that Defendants' actions are not excusable by the either defense. The Amended Complaint alleges that the Defendants themselves reviewed and approved each of the Loss Loans, and that certain Defendants approved the dividend payments and the expenditures for personal use, each with full knowledge of the precarious financial state of the Bank. Likewise, the Amended Complaint alleges that Defendants themselves - not their subordinates - received

14

repeated warnings from both the FDIC and the IDFPR that the Defendants' management of the Bank had serious failings, including undersecured loans, unsafe levels of reserves, and insufficient staff to adequately monitor loans and associated collateral, and alleges that the Director Defendants were aware of these warnings but took no action to rectify the concerns. The Amended Complaint alleges that by 2008, regulators warned the Director Defendants that these failings "presented an imminent threat to the institution's viability," and the Director Defendants still took no action, and that then-Chairman Pethinaidu Veluchamy declined to meet with the regulators to discuss these issues. Taking the facts in the Amended Complaint as true, Defendants' acts, and failure to act, cannot be excused by the business judgment rule or the Illinois Banking Act.

### D. Gross Negligence as a Separate Cause of Action (Count VII)

Several Defendants move to dismiss Count VII, an Illinois state law claim for gross negligence, for failure to state a valid claim under Illinois law. In Illinois, "gross negligence" is a standard - see part A above - but is not, of itself, an independent common law cause of action. *See Doe ex rel. Ortega-Piron v. Chi. Bd. Of Educ.*, 802 N.E.2d 418, 423 (Ill. 2004) ("To plead willful and wanton conduct, a plaintiff must allege either a deliberate intention to harm of an utter indifference to or conscious disregard for the welfare of the plaintiff"); *Merit Ins. Co. V. Colao*, 603 F.2d 654, 659 (7th Cir. 1979) ("Illinois does not recognize gross negligence as an independent ground for recovery"); *Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc.*, 2005 WL 3159680 at *10 (N.D. Ill. 2005) (noting judicial consensus that Illinois does not allow a cause of action for gross negligence) (collecting cases). Therefore, Count VII is dismissed with prejudice.

### E. Duplicative Nature of Count VIII

Finally, several Defendants move to dismiss Count VIII, a claim for negligence and breach of fiduciary duty based on failure to supervise, as duplicative of Counts II and III (negligence and breach of fiduciary duty, respectively), which Counts have been pleaded in the alternative. Count VIII, however, pleads breach of fiduciary duty *and* negligence in the same claim, with respect to the Director Defendants' failure to supervise the management of loans, and pleads the same amount of damages as pleaded for those counts related to the Loss Loans. Yet unlike Counts II and III, which relate to specific allegations regarding the twelve Loss Loans, Count VIII's allegations generally aver a failure to oversee staff who determined which loans should be approved, and when to follow the Bank's loan policy.

Presumably, the FDIC pleads Count VIII as a failure to supervise in the event that Defendants offer as a defense to Counts II and III that they had no direct involvement in the determination to make the Loss Loans, and merely approved them, and should therefore be protected by the business judgment rule. If that is the FDIC's position, however, then Count VIII should be pleaded in the alternative to Counts II and III. It is not. As presently pleaded, Count VIII is an independent cause of action that is duplicative of Counts II and III. Count VIII is therefore dismissed without prejudice, with leave to replead if the FDIC can do so without duplicating the relief requested in Counts II and III.

F.      *Claims Against Attorneys (Counts IX, X and XI)*

Finally, the FDIC has alleged three claims against both Regas, in his capacity as general counsel to the Bank, and the Regas Firm, as retained Bank counsel, for malpractice, breach of fiduciary duty, and aiding and abetting.

In order to state a claim for malpractice, the FDIC must allege: (1) an attorney-client relationship; (2) a duty arising from that relationship; (3) a negligent act or omission on the part of the attorney; (4) causation; and (5) actual damages. *See Palmaros v. Barcelona*, 284 Ill. App. 3d 642, 646 (Ill. App. 1996). The attorney-client relationship and the duty arising from it are defined by the scope of any express or implied contract for legal services. *See Majumdar v. Lurie*, 274 Ill. App. 3d 267, 270 (Ill. App. 1995). "Accordingly, in order to properly state a claim for legal malpractice where an attorney has failed to advise a client, the client must allege that the scope of representation sought by the client included the advice that the defendant sought to give." *See, e.g., Dahlin v. Jenner & Block, LLC*, 2001 WL 855419 (N.D. Ill. July 26, 2001) (Holderman, J.)

The FDIC alleges that Regas and the Regas Firm failed in its due diligence with respect to certain of the Loss Loans, failed to properly advise the Bank as to its response to the regulatory reports and investigations, and as to the serious financial consequences of the Loss Loans for which the Regas Firm provided counsel, and knowingly and substantially assisted the Director Defendants in approving the Loss Loans and in allowing them to continue without adequate staffing or monitoring. As noted by the FDIC, courts in other districts have permitted complaints with similar facts to survive the pleadings stage, on grounds that a defendant law firm's failure to warn directors and officers that their practices subjected the bank to a high risk of loss could constitute malpractice. *See, e.g., FDIC v. Wise*, 758 F. Supp. 1414, 1418 (D. Colo. 1991); *FDIC v.*

*Martin*, 801 F. Supp. 617, 619-20 (M.D. Fla. 1992). This Court agrees, that because the FDIC has

pleaded specific facts as to the Loss Loans and regulatory warnings on which Regas and the Regas

Firm failed to adequately advise the Bank, the motions to dismiss Counts IX, and XI will be denied.

However, the Court cautions the FDIC to address early in the discovery process the scope of the

engagement of the Regas Firm by the Bank, and to amend the Amended Complaint accordingly

should the engagement not cover the acts alleged.

While it is possible to plead separate counts of breach of fiduciary duty and negligence in

the alternative in the same complaint (see Section A above), the inquiry for purposes of dual claims

of breach of fiduciary duty and malpractice under Illinois state law focuses upon whether the

complaints contain any independent allegations. *See Metrick v. Chatz*, 639 N.E. 2d 198, 203 (Ill. App.

Ct. 1994) (dismissing breach of fiduciary duty count as duplicative of legal malpractice count when

allegations mirrored one another); *accord Dahlin*, 2001 WL 855419 at *10; *Kirkland & Ellis v. CMI

Corp.*, 1996 WL 559951 *9 (N.D. Ill. Sept. 30, 1996) (Andersen, J.) Other than an unexplained change

in the amount of damages requested, and the change of the phrasing of the duty from one of

representation to one of advising the Bank and the Board, the counts are identical. As stated

above, the scope of the representation of the Bank by Regas and the Regas Firm is an important

element of these counts. Either the Regas Firm was retained to advise the Bank in addition to

representation related to the loans, in which case breach of fiduciary duty is part of the alleged

malpractice; or, the Regas Firm was not retained to advise the Bank, in which case there was no

fiduciary duty to breach. Either way, the breach of fiduciary duty fails as to the Regas Firm. As

for Regas personally, he has already been alleged to have breached fiduciary duty in approving

18

the Loss Loans in Count II of the Amended Complaint, and the Loss Loans in Count X are a subset of the Loss Loans in Count II.   Therefore, Count X is dismissed with prejudice as to all Attorney Defendants.

**Conclusion**

For the reasons set forth herein, Counts VII and X are dismissed with prejudice.  Count VIII is dismissed without prejudice, with leave to replead within 30 days of the date of this Opinion. The motions to dismiss are denied with respect to Counts I-VI, IX, and XI.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: July 26, 2012